1  TREVOR G. JACKSON, SBN 241929
   LAW OFFICE OF TREVOR G. JACKSON
2  707 Randolph Street, Suite 204
   Napa, California 94559-2950
3  Tel:    (707) 257-7750
   Fax:    (707) 307-7140
4  Email: tjackson@experto-crede.com

5  Attorney for Plaintiff BARRIE D. SANDY

6

7                    UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9  BARRIE D. SANDY, an individual,          ) Case No.
                                            )
10         Plaintiff,                        ) COMPLAINT FOR BREACH OF CONTRACT;
                                            ) COMMON COUNTS; NEGLIGENCE; FRAUD;
11  v.                                       ) PROFESSIONAL NEGLIGENCE; BREACH OF
                                            ) FIDUCIARY DUTY; INTENTIONAL
12  MARK C. McCLURE, an individual; PAULA    ) INFLICTION OF EMOTIONAL DISTRESS;
   R. WALLEM, an individual; JOY E.         ) UNJUST ENRICHMENT
13  TARBELL, an individual, JOY TARBELL      )
   REALTY, LLC dba PRUDENTIAL JOY           )
14  TARBELL REALTY, a New Hampshire limited  )
   liability company; MB EQUITY PARTNERS,   )
15  LLC, a Delaware limited liability company; ) DEMAND FOR JURY TRIAL
   DOES 1 through 20,                       )
16                                           )
           Defendants.                       )
17                                           )
                                            )
18 ─────────────────────────────────────────)

   Plaintiff Barrie D. Sandy, by his undersigned attorney, alleges as follows:
19
                         **SUMMARY OF BACKGROUND**
20
       1.      In this action, Plaintiff Barrie D. Sandy ("Plaintiff") is seeking judgment from this
21
   Court to recover damages in excess of $500,000.00, in addition to lawful interest and ongoing
22
   damages, arising out of the named Defendants' egregious misconduct and mishandling hundreds of
23
   thousands of dollars, engagement in multiple fiduciary breaches, willful misconduct, negligence,
24
   fraud, and related causes of action, in violation of common and statutory claims prohibiting such
25

                                      1
                                  COMPLAINT

1    deceptive and unfair practices, which gives rise to this Court's jurisdiction to issue injunctive orders

2    and award monetary damages for such conduct. At all times alleged herein, the defendants, and each

3    of them had actual knowledge of the special and consequential damages Plaintiff would suffer at the

4    time of agreement when Plaintiff transferred his personal funds to the defendants' respective accounts.

5        2.    As set forth further herein, Defendants Mark C. McClure ("McClure") and Paula R.

6    Wallem ("Wallem") continuously and systematically misused Plaintiff's investment funds in a wanton

7    and reckless manner, engaged in self-dealing, and misappropriated funds for personal expenses, and

8    Defendant Joy E. Tarbell ("Tarbell") facilitated and abetted such conduct in her capacity as a principal

9    realtor of Defendant Joy Tarbell Realty, LLC dba Prudential Joy Tarbell Realty ("PJTR"), involved

10    with the purchase and sale of commercial real property to Plaintiff, McClure and Wallem.

11        3.    Defendants McClure and Wallem did not simply make bad or highly speculative

12    investments, they systematically breached the trust that Plaintiff had placed in them as business

13    partners by: (a) failing to disclose material facts regarding McClure's previous adjudicated liabilities;

14    (b) binding Plaintiff to obligations without his consent; (c) committing acts of forgery and perjury to

15    induce Plaintiff to further fund alleged "business" investments; (d) deliberately excluding Plaintiff

16    from business transactions with actual knowledge of his opposition; (e) deliberately exposing Plaintiff

17    to potential litigation by mishandling investment funds; (f) deliberately making personal expenditures

18    unrelated to business investments without the knowledge or consent of Plaintiff, and; (g) personally

19    guaranteeing reimbursements of loans provided by Plaintiff with actual knowledge of insolvency,

20    among other malicious conduct, all of which resulted in harms to Plaintiff while a citizen of

21    California.

22        4.    Defendant Tarbell further conspired with the other defendants by using her position of

23    trust as a Realtor and principal brokerage escrow account holder to induce Plaintiff into making wire

24    deposits into an escrow account under the pretext that such funds would be applied to purchasing

25    commercial real property, refusing to return such funds after the transaction could not be

1  consummated, deliberately withholding material information from Plaintiff, and failing to disclose her

2  agency relationship to the parties regarding the commercial property transaction, all of which resulted

3  in harms to Plaintiff.

4                                          **THE PARTIES**

5       5.     At the time this action was filed and at all times thereafter, Plaintiff Sandy is a United

6  States citizen and resident of the State of California.

7       6.     At all times pertinent to this action, Plaintiff Sandy acted in the capacity of an investor

8  and passive member with no management or control over the entity identified in paragraph 9 of this

9  Complaint.

10      7.     Plaintiff is informed and believes, and on that basis alleges, that at all times pertinent to

11  this action, Defendant McClure is and was a citizen of the States of Maine and New Hampshire.

12  Plaintiff is further informed and believes that McClure is lawfully married to Defendant Wallem.

13      8.     Plaintiff is informed and believes, and on that basis alleges, that at all times pertinent to

14  this action, Defendant Wallem is and was a citizen of the States of Maine and New Hampshire.

15  Plaintiff is further informed and believes that Wallem is lawfully married to Defendant McClure.

16      9.     Plaintiff is informed and believes, and on that basis alleges, that at all times pertinent to

17  this action, Defendant MB Equity Partners, LLC ("MB Equity") is a limited liability company

18  managed by Defendant Wallem, duly organized and existing under the laws of the State of Delaware,

19  with its principal place of business in the State of New Hampshire.  Therefore, pursuant to 28 U.S.C. §

20  1332(c)(1), at the time said action was commenced and at all times thereafter, Defendant MB Equity is

21  a citizen of both the State of Delaware and the State of New Hampshire.

22      10.    Plaintiff is informed and believes, and on that basis alleges, that at all times pertinent to

23  this action, Defendant PJTR is a limited liability company, duly organized and existing under the laws

24  of the State of Delaware, with its principal place of business in the State of New Hampshire.

25      11.    Plaintiff is informed and believes, and on that basis alleges, that at all times pertinent to

1    this action, Defendant Tarbell is a citizen of the State of New Hampshire and is Principal of Defendant

2    PJTR, with its principal place of business in the State of New Hampshire; Plaintiff further alleges that

3    Defendant PJTR is a mere shell of individual Defendant Tarbell; there is such unity of interest and

4    ownership between PJTR and Tarbell in that the separate personality of the limited liability company

5    no longer exists and, if the acts are treated as those of the entity alone, an inequitable result will

6    follow. Plaintiff therefore alleges that Defendant Tarbell is personally liable for any and all damages

7    alleged herein against Defendant PJTR under the alter ego doctrine..

8        12.    Plaintiff further alleges that Defendant MB Equity is a mere shell of individual

9    Defendants Wallem and McClure; there is such unity of interest and ownership between MB Equity

10   and Defendants Wallem and McClure in that the separate personality of the limited liability company

11   no longer exists and, if the acts are treated as those of the entity alone, an inequitable result will

12   follow. Plaintiff therefore alleges that Wallem and McClure, and each of them, are personally liable

13   for any and all damages alleged herein against Defendant MB Equity under the alter ego doctrine.

14       13.    Plaintiff is ignorant of the true names and capacities of Defendants sued as Does 1

15   through 20, inclusive, and therefore sues these defendants by these fictitious names. Plaintiff will

16   amend this complaint to allege their true names and capacities when that information is ascertained.

17   Plaintiff is informed and believe, and thereon allege, that each of the fictitiously named defendants is

18   tortiously or otherwise legally responsible in some manner for the occurrences alleged in this

19   Complaint and for Plaintiff's damages.

20       14.    Plaintiff is informed and believes, and on that basis alleges, that at all times relevant to

21   this Complaint, unless otherwise stated, Defendants McClure, Wallem, MB Equity, PJTR, and Tarbell

22   (collectively referred to herein as "Defendants"), and each of them, were the agents, employees, co-

23   venturers, partners, co-conspirators, or in some manner agents or principals, or both, for each other,

24   and at all times, each of the Defendants were acting within the course and scope of said agency,

25   employment, venture, partnership, and/or conspiracy.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a), as there is diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

16.     Venue is proper in this Judicial District because Plaintiff is a citizen of the State of California, within this judicial district, and a substantial part of the conduct, events or omissions giving rise to the claims arose in the Northern District, and because Plaintiff has been, and continues to be, injured in this judicial district, as set forth under 28 U.S.C. § 1391(b).

17.     This Court has personal jurisdiction over Defendants because the wrongful acts and harms complained of herein were committed in California with foreseeable consequences and injury to Plaintiff in California. Further, the defendants purposely availed themselves of the privilege of conducting activity in the State of California; the claims and harms alleged herein arise from such activity, and; the exercise of jurisdiction is reasonable.

## FACTUAL BACKGROUND

18.     Plaintiff has lived in the County of Napa, California for the majority of his life. Plaintiff temporarily resided in both the States of California and Arizona due to his employment for several years. He returned to the Napa in or about May 2007.

19.     Plaintiff and McClure first had communications in June 2006, when McClure posted an online advertisement on the website, Craigslist.com, looking for potential licensees for an infomercial created for his company, Mark McClure International ("MMI"). Said infomercial, which toted McClure's so-called "Ruthless Entrepreneur" program, was purportedly shown on national television, including but not limited to NBC, Comcast Sports Net, Fox Sports, Fine Living Network, Fit TV, NESN, and WGN. McClure represented himself as CEO of MMI and purportedly made millions of dollars providing training workshops for more than two hundred of the Fortune 500 companies, including but not limited to: Hilton, Marriott, RE/MAX, Hyatt, Keller Williams Realty, Century 21,

1    Mercedes-Benz, Sheraton, General Motors, Siemens, Coldwell Banker, American Express, MetLife,

2    Chrysler, Morgan Stanley, Canon, BMW, Audi, Verizon, Merrill Lynch, Legg Mason, Jaguar, Ford,

3    Land Rover, Konica Minolta, Volkswagen, Sears, Mitsubishi, Xerox, AT&T, Prudential Financial,

4    Prudential Real Estate, Allstate, Pulte Homes, GMAC Real Estate, Newmark Homes, Kyocera,

5    PropNex, Herbalife, Manulife, RadioShack, David Weekley Homes, GAMA, Bally Total Fitness,

6    Republic Title, Porsche.

7        20.    When Plaintiff first had communications with McClure, Plaintiff was temporarily

8    residing in Arizona, while his family remained in Napa, California. Although Plaintiff was employed,

9    he was interested in finding investment opportunities and saw McClure's business opportunity as a

10   means of learning about that industry. After initiating contact, McClure and Wallem entered into a

11   business relationship with Plaintiff, as more thoroughly set forth herein.

12       21.    In or about February 2007, Plaintiff decided to move back to Napa, California, and he

13   informed McClure of the same. Plaintiff and McClure continued to look for investment opportunities,

14   specifically revenue-generating real estate investments. The specific transactions between Plaintiff and

15   Defendants are set forth below.

16   I.    "STREET SMART [A.K.A. 'RUTHLESS'] ENTREPRENEUR"

17       22.    On or about May 16, 2006, Plaintiff responded to McClure's Craigslist.com posting to

18   receive further information regarding the business opportunity with MMI.

19       23.    Defendant McClure immediately responded to Plaintiff's inquiry about the business

20   opportunity as follows: (a) for a licensing fee in the amount of $5,000.00, MMI would provide

21   infomercials in the form of a DVD that would be played on local televisions networks within the

22   licensee's region; (b) the licensee would be required to pay for the airtime, however MMI would cover

23   the costs of the toll-free telephone lines and the "24/7 operators" who would process the orders; and

24   (c) at the end of each week, the licensee would receive one-half of the sale proceeds based on his or

25   her regional territory. McClure further stated that the licensing rights would be effective for not less

than two years and the licensee would have rights to any additional commercial content so long as the licensee continues participating in the program.

24.    Plaintiff asked McClure about the specific fees and costs to be anticipated, in light of airtime expenses and other costs. Plaintiff, who expressed serious interest in the opportunity, requested a two-minute sample of the infomercial to get a better idea of what he would be investing. About one month later, McClure informed Plaintiff that only one license was available as the other licenses had been distributed. Plaintiff expressed concern about not seeing the actual product before investing his money, and his reticence was based on prior business dealings in which he was "burned."

25.    On or about June 22, 2006, McClure assured Plaintiff that he would not be "burned" and the four other licensees agreed to add Plaintiff as a licensee. He further stated that the infomercials, consisting of business and marketing tactics to increase revenue for entrepreneurs and established companies, was viable and completely vetted. To wit: (a) one of the licensees held an MBA degree and already negotiated with media outlets to broadcast the infomercials, and based on his expertise, the product was guaranteed to generate revenue; (b) another licensee was an "Internet guru" who would market the product on the Internet, implement databases, and provide technical expertise; (c) the third licensee was a high level cable television executive, located in Portland, Oregon; (d) the fourth licensee was a successful entrepreneur, located in Chicago, Illinois; and (d) the infomercial had been produced, scripts were written, the advertising agencies and call centers were in place, and up to eighty-eight million households would view the infomercials.

26.    Based on McClure's assurances, Plaintiff decided to enter into a licensing agreement, including exclusive rights to the San Francisco Bay Area region. He further divulged his background experience in real estate development projects, public speaking, and public relations.

27.    On or about July 2, 2006, Plaintiff sent the executed licensing agreement to McClure by fax, and they implemented the launch of the infomercial. Said agreement specified that Plaintiff would receive exclusive marketing rights of MMI's infomercials for the western region of the country,

1    including but not limited to the State of California. A true and correct copy of the executed MMI

2    Street Smart Entrepreneur License Agreement is attached hereto as Exhibit 1 and incorporated herein

3    by this reference.

4         28.    Due to the disappointing results of the infomercial venture, the project was ultimately

5    abandoned. Based on Plaintiff's professional background, McClure suggested that they form an entity,

6    and invest in commercial real estate ventures to recoup the MMI's losses from the failed infomercial

7    campaign.

8    **II.    COMMERCIAL PROPERTY INVESTMENTS AND MB EQUITY FORMATION**

9         29.    During the time between August 2006 and January 2007, McClure and Plaintiff

10   explored potential real estate investments. They elected to organize a business entity, to be managed

11   and operated chiefly by Wallem and McClure, which would be capitalized by Plaintiff.

12        30.    Based on his existing relationship with a property developer in the State of Maine,

13   McClure negotiated the purchase of a condominium in the Ocean Ridge development located in

14   Portland, Maine ("Ocean Ridge Condos"), and advised Plaintiff of the availability of two other

15   condominiums that could be managed and operated by McClure and Wallem as a joint business

16   venture. Being that the business entity was still in the formation process, Plaintiff financed the

17   purchase of two Ocean Ridge Condos with primary and secondary mortgages, and both properties

18   were deeded to Plaintiff as an individual. The property that was initially purchased by McClure and

19   Wallem was intended for their personal use. McClure and Wallem agreed to manage the Ocean Ridge

20   Condos by marketing the properties to potential buyers and/or lease the same to tenants. Additionally,

21   they agreed to cover the monthly mortgage payments, to receive security deposits and monthly rent,

22   and to apply any rent income towards the mortgage payments.

23        31.    Concurrently, in January 2007, MBEP was organized as a limited liability company in

24   the State of Delaware for the purpose of establishing upscale boutique hotels. Plaintiff was issued

25   fifty-percent (50%) of the outstanding membership interest in MB Equity and McClure then allegedly

took measures to publicly trade MB Equity on the Over-The-Counter Bulletin Board (OTCBB) securities market and independently consulted with an attorney to transact the same. Further, McClure and Wallem allegedly sought investors for the company to comply with OTCBB requirements. Meanwhile, Plaintiff was working with a California-based design office to create MB Equity marketing and promotional materials.

32.    On February 12, 2007, Plaintiff provided a loan in the amount of $100,000.00 at eight-percent (8%) per annum to MB Equity as secured by an agreement ("Loan Contract") personally guaranteed by McClure. The loan contract requires McClure to cover eighty-percent (80%) of all monthly losses for the Ocean Ridge Condos, a ten-percent (10%) penalty on the principal balance for any delayed payments on overhead obligations, and a personal guarantee to pay off the principal amount to Plaintiff in the event that additional funding cannot be raised from MB Equity property investments. A true and correct copy of the Loan Contract, dated February 11, 2007, is attached hereto as Exhibit 2 and incorporated herein by this reference.

33.    During the period between February 2007 and July 2007, McClure assured Plaintiff that investors were prepared to outlay capital for the public offering, but was allegedly advised to first obtain a hotel property prior to being listed on the OTCBB. Based thereon, McClure and Wallem traveled throughout the country, the United States Virgin Islands, and internationally to Mexico to purportedly negotiate MB Equity's acquisition of hotel and resort properties. In addition, McClure, Wallem and Plaintiff consorted with hotel management companies located on the East Coast and California, while working with lenders and professional investment real estate brokerages on both the West and East Coasts to acquire properties to renovate.

34.    In or about June 2007, McClure and Wallem initiated negotiations with Portland Hotel Associates, LLC, organized under the laws of the State of Maine, and having a business office at Somera Capital Management, LLC, organized under the laws of the State of California, for the purchase of the Eastland Park Hotel, located at 157 High Street, Portland, Maine ("Eastland").

35.     On or about August 1, 2007, Plaintiff made a wire deposit from his personal account in the amount of $250,000.00 into an escrow account held by First American Title Insurance Company, located in Los Angeles, California, as the initial deposit for the purchase of Eastland. As an incentive for the financing, and to cover Plaintiff's finance charges, McClure promised to pay Plaintiff $5,000.00 per month for the $250,000.00 deposit. While the funds remained in escrow, McClure paid $5,000.00 to Plaintiff during the first month. During the month of September 2007, Plaintiff received another check for $5,000.00, but McClure inexplicably cancelled payment before Plaintiff could deposit the check. Prior to the expiration of the due diligence period, substantial structural issues were discovered and the purchase of Eastland was cancelled. Consequently, the escrow deposit was returned to Plaintiff on or about September 12, 2007, and the parties continued to search for an investment property.

36.     Prior to informing Plaintiff, Defendants McClure and Wallem executed and personally guaranteed a promissory note, dated August 30, 2007, in the amount of $35,500.00 for the services of AAA Energy Service Company related to the Eastland project. Plaintiff was never provided with said promissory note until February 14, 2008, when he discovered that McClure and Wallem had forged Plaintiff's signature.

## III.    THE WILD BOAR TAVERN

37.     Unbeknownst to Plaintiff, on or about August 15, 2007, a judgment creditor filed an involuntary bankruptcy action in the United States Bankruptcy Court for the District of Maine against McClure to freeze his assets for the purpose of collecting on the judgment under 11 U.S.C. § 303(b). At all times alleged herein, this material fact was deliberately withheld from Plaintiff by Wallem, McClure, Tarbell, and PJTR.

38.     On October 6, 2007, McClure informed Plaintiff that he managed to negotiate a three (3) year lease and financing agreement to acquire a commercial property, commonly known as The Wild Boar Inn and Tavern ("Wild Boar") located at 3465 White Mountain Highway, North Conway,

New Hampshire. Plaintiff was further informed of the following: the monthly rent under the lease was "$7,500.00 per month, to include the use of $250,000+ of the FF&E [*furniture, fixtures, and equipment*] as well as the use of 4 top notch hotel rooms (all though [*sic*] we will need to furnish 2 of them). 50% of that $7,500 per month will be applied to the purchase price at the end of year as a credit, if we do not pull the trigger, it will be applied later on, but only a 50% credit from the first year." Further, Plaintiff was advised that they "will be a 50-50 partnership" and that "it is my intention to pay you $5,000 every month to be applied to the loans. In addition, we will cut you a check of 50% of the profits (after expenses of course)…"

39.    After some further correspondence with McClure and Wallem, and under their alleged threat that the deal would expire, Plaintiff made a wire transfer from his Chase checking account into Defendant PJTR's escrow account in the amount of $10,000.00 on October 19, 2007 as an escrow deposit for the purchase of the Wild Boar. PJTR and Tarbell persistently corresponded with McClure, Wallem, and Plaintiff, with expressed concerns regarding the alleged delay of Plaintiff's wire transfer.

40.    Subsequent to making the initial escrow deposit, Plaintiff continuously requested a copy of the Purchase and Sale Agreement and Deposit Receipt ("Purchase Agreement") and Commercial Lease for the Wild Boar ("Commercial Lease") from McClure and Wallem. A draft of the Commercial Lease was finally provided to Plaintiff by email on October 30, 2007, but was ultimately executed by Wallem on behalf of MB Equity on November 16, 2007. At all times herein alleged, the Commercial Lease does not contain any provisions regarding escrow deposits into the PJTR escrow account. A true and correct copy of the Agreement of Commercial Lease, dated November 16, 2007, is attached hereto as Exhibit 3 and incorporated herein by this reference.

41.    At all times alleged herein, Plaintiff was never provided with a true and correct copy of the executed Purchase Agreement with all effective addendums until March 24, 2008. A true and correct copy of the Purchase and Sales Agreement and Deposit Receipt, last amended on November 25, 2007, is attached hereto as Exhibit 4 and incorporated herein by this reference. Upon receipt of the

1    Purchase Agreement, it was discovered that Defendants, and each of them, unilaterally amended the

2    Purchase Agreement without Plaintiff's informed consent. Moreover, two of the four addendums to

3    the Purchase Agreement, which were prepared by Tarbell, revealed that Plaintiff's name was included,

4    but was subsequently scratched out by the Defendants (Exhibit 4, at pp. 7-8).

5        42.    In addition, Tarbell and PJTR failed to disclose that she was acting in the capacity of

6    the landlord's agent on the face of the agreement. (Exhibit 4, at p. 1) Further, the only escrow

7    instructions contemplated within the transaction were set forth in the Purchase Agreement. The

8    instructions stated that $10,000.00 would be deposited into the PJTR escrow account. (Exhibit 4, at p.

9    1) McClure and Wallem consistently assured Plaintiff that he would be a fifty-percent (50%) owner;

10   that the financing was completed, and; the seller and property owner of the Wild Boar, Thomas

11   Hanley ("Seller"), would pay out $200,000.00 at closing under the agreement. Based thereon,

12   McClure and Wallem requested that Plaintiff provide more funds for both the operational costs and

13   additional escrow deposits under the Purchase Agreement.

14       43.    During the latter half of October 2007 and up until mid-November 2007, McClure and

15   Wallem promised to provide all information, make financial arrangements, and also acknowledged the

16   amounts owed to Plaintiff. As each day progressed towards the projected closing date, McClure would

17   feign agreement with Plaintiff so that Plaintiff would transfer more funds. When Plaintiff made the

18   requested wire transfers, McClure would manipulate the parties' previous agreements in order to find

19   reasons to demand more funds. For example, when Plaintiff raised reasonable concerns about not

20   being provided with documents or accountings related to the transaction, McClure and Wallem would

21   only respond with irrelevant issues, such as bogus costs that Plaintiff allegedly owed to them, and they

22   would also evade any prior oral and written commitments promised to Plaintiff. Ultimately, McClure

23   and Wallem would threaten to remove Plaintiff from MB Equity if he did not immediately transfer

24   funds to them, and did not inform him that his removal was impermissible under the laws of Delaware

25   and New Hampshire.

44.    On that basis and on the threat of losing over $100,000.00 which he already invested in MB Equity, the prospect of carrying the mortgage payments and managing the Ocean Ridge Condos from across the country, and the promises of reimbursement from Defendants and Seller, Plaintiff transferred the additional funds to secure the Wild Boar.

45.    On November 13, 2007, Plaintiff made a wire transfer from his Chase checking account into a Bank of New England account in the amount of $7,500.00 to secure due diligence fees in order to finance the acquisition of the Wild Boar Tavern.

46.    That same day, Plaintiff received a MB Equity Operating Agreement from Wallem by email; nearly one year after the company was organized. In her email to Plaintiff, she stated: "It has NOTHING to do with the loans. Those are separate docuents [*sic*] and they supersead [*sic*] the LLC agreement."

47.    On November 15, 2007, Plaintiff made another three wire transfers from his Chase checking account into PJTR's escrow account in the amounts of $3,200.00; $9,999.00; and $10,000.00 as escrow deposits for the purchase of the Wild Boar.

48.    At no time herein alleged did PJTR and Tarbell disclose to Plaintiff that these amounts were to be held as a security deposit in the event that McClure and Wallem defaulted under the Commercial Lease. Based on the information provided to Plaintiff, and Defendants' failure to disclose the executed and effective documents, as amended, Plaintiff deposited a total of $23,199.00 into PJTR's escrow account on November 15, 2007 for the purchase of the Wild Boar. Based on such information and belief, Plaintiff reasonably believed that he had deposited a total amount of $33,199.00 into PJTR's escrow account which would have been returned to him if the transaction was not consummated.

49.    On November 19, 2007, Plaintiff made an additional three wire transfers from his Chase checking account into MB Equity's checking account in the amounts of $2,300.00; $9,999.00; and $10,000.00 for operating expenses for the Wild Boar.

50.     That same day, McClure submitted his schedule of assets and debts to the United States Bankruptcy Court where he swore under penalty of perjury that his average monthly income was $350.00, he owed approximately $9,000.00 to the Internal Revenue Service, his total assets amounted to approximately $1,450.00, and he did not have any other secured or unsecured obligations against him. At all times alleged herein, neither McClure nor Wallem disclosed this material fact to Plaintiff.

51.     From November 19, 2007 through November 26, 2007, Wallem and McClure failed to pay the monthly mortgage payments on Plaintiff's Ocean Ridge Condos. As a result, Plaintiff's credit score was drastically affected. Although, Wallem and McClure did use MB Equity funds to pay the mortgages on their Ocean Ridge Condo in the amount of $3,563.76, and Wallem also used the funds to pay her American Express Card in the amount of $2,385.00.

52.     On November 25, 2007, Wallem executed an addendum to the Purchase Agreement which was prepared by Tarbell and PJTR. Unlike the prior addendums where Plaintiff's name had been scratched out by Defendants, Plaintiff's name was not on this form. Without the consent or knowledge of Plaintiff, the individual who deposited all funds held in PJTR's escrow account, the buyers and sellers agreed to transfer $5,000.00 of the escrow deposit to the Seller and his wife Karen Hanley (Exhibit 4, at p. 9).

53.     On December 13, 2007, Plaintiff made one (1) wire transfer from his Chase checking account into Defendants' checking account in the amount of $10,000.00 for operating expenses for the Wild Boar Tavern. Contrary to Defendants' representations that business was going well, such funds were immediately invaded and exhausted.

54.     On December 14, 2007, Plaintiff made a wire transfer from his Chase checking account into MB Equity's checking account in the amount of $9,999.00 for operating expenses for the Wild Boar. McClure and Wallem represented to Plaintiff that the business was going well, but to the contrary, they immediately invaded and exhausted said funds.

55.     On December 27, 2007, Plaintiff made a wire transfer from his Chase checking account

1    into MB Equity's checking account in the amount of $10,000.00 for operating expenses for the Wild

2    Boar. Contrary to what McClure and Wallem represented to Plaintiff in that the business was going

3    well, the funds were immediately invaded and exhausted.

4        56.    On January 3, 2008, Plaintiff made a wire transfer from his Chase checking account

5    into MB Equity's checking account in the amount of $10,000.00 for operating expenses for the Wild

6    Boar Tavern. Again, contrary to what McClure and Wallem represented to Plaintiff in that the

7    business was going well, they immediately invaded and exhausted the funds.

8        57.    After January 3, 2008, Plaintiff informed McClure and Wallem that he had satisfied his

9    outlay to MB Equity in the amount of $150,000.00 to secure the Wild Boar after deducting penalties

10    and fees caused by the unpaid Ocean Ridge Condo payments. Plaintiff further stated that he had

11    already invested approximately $250,000.00 in the business venture, including the unpaid amount still

12    owed by McClure, as per the Loan Contract, which was well over the amount originally agreed upon.

13    Plaintiff demanded that McClure and Wallem enter into an agreement drafted by an attorney before

14    any further distributions from him were made.

15        58.    On January 14, 2008, McClure caused Wallem to organize Black Diamond Restaurant

16    Group, LLC ("Black Diamond") for the purpose of holding an interest in the business operations of

17    the Wild Boar. The members of Black Diamond were Wallem and Bob Poor ("Poor"), who was

18    another investor brought on by McClure. At all times alleged herein, Defendants did not disclose this

19    material fact to Plaintiff until after the Wild Boar transaction was starting to collapse.

20        59.    On January 15, 2008, McClure demanded that Plaintiff wire the amount of $15,000.00

21    to MB Equity's operating account as Plaintiff's counsel drafted the proposed business agreement.

22    McClure calculated this amount based on the alleged shortfall of capital provided by Plaintiff after

23    deducting the Ocean Ridge Condo payments. Plaintiff took the matter under consideration.

24        60.    On January 25, 2008, McClure emailed a new MB Equity operating agreement

25    ("Operating Agreement") to the attorney who had organized Black Diamond. McClure claimed that

the new agreement was created because he had lost the original one after providing it to the New Hampshire Liquor Commission. Plaintiff was not informed of, or consented to, any revisions to the Operating Agreement in violation of the agreement and Delaware Limited Liability Company Act.

61.    On or about January 29, 2008, Plaintiff received two documents from the attorney who organized Black Diamond. The documents conveyed all of Plaintiff's MB Equity membership interests to Wallem. Plaintiff did not execute said documents.

62.    After it was apparently clear that the sale of the Wild Boar would not consummate, due to Defendants' actions, Plaintiff demanded the return of the escrow deposits he made and held in PJTR's escrow account. Plaintiff was informed that only $5,000.00 remained. Plaintiff was then provided with a copy of the entire Purchase Agreement and a legible copy of the Commercial Lease which are attached as Exhibits 4 and 3 respectively.

63.    In February 2008, Wallem and McClure abandoned the Ocean Ridge Condos in entirety. Further, Wallem and McClure failed to return their tenants' deposits and attempted to assign such liabilities to Plaintiff as an individual. Consequently, Plaintiff has incurred substantial losses by maintaining payment on the Ocean Ridge Condos, and is unable to obtain new tenants for the vacated condominium.

64.    In sum, as a result of the unauthorized, improper, and tortious conduct by McClure, Wallem, Tarbell, and PJTR, Plaintiff has suffered losses of hundreds of thousands of dollars and incurred substantial legal, banking, interest and other fees.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract as to Defendants MB Equity, McClure, and Wallem)**

65.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 64 of this Complaint.

66.    Plaintiff is informed and believes, and based thereon allege, that Defendants MB Equity, McClure and Wallem, and each of them, entered into an agreement with Plaintiff, which

1    included but not limited to the following representations and promises: (a) the per annum interest for

2    the amount financed would be eight-percent (8%), and the funds were to be used exclusively for MB

3    Equity property investments; (b) Plaintiff shall have senior rights to collect on the loan monies over

4    other creditors; (c) all MB Equity obligations shall be paid timely and promptly; (d) in the event of

5    MB Equity's default on any obligations, such obligation is automatically assigned to McClure

6    personally, who will also pay a ten-percent (10%) penalty fee on the outstanding amount owed; (e)

7    Plaintiff shall be compensated for the Ruthless Entrepreneur losses; (f) the leasing, sale, and

8    maintenance of the Ocean Ridge Condos shall be managed by MB Equity, McClure and Wallem, and;

9    (g) McClure shall cover eighty-percent (80%) of all monthly losses incurred from the Ocean Ridge

10   Condos project.

11        67.    Plaintiff performed his duties under the agreement with Defendants, by transferring

12   funds in the amount of $100,000.00 to MB Equity's business account operated and controlled by

13   Defendants McClure and Wallem, except for those terms which performance was excused and/or

14   waived by the conduct of these Defendants and their agents.

15        68.    Plaintiff is informed and believes, and based thereon alleges, that Defendants have

16   breached the written and oral agreements which included but not limited to the following breaches: (a)

17   the funds were not exclusively for MB Equity property investments, and Plaintiff was not paid the

18   eight-percent (8%) per annum interest on the loan as agreed upon; (b) Defendants disregarded

19   Plaintiff's senior rights to collect on the loan monies over other creditors; (c) All MB Equity

20   obligations were not paid timely and promptly, and were ultimately abandoned by these defendants,

21   including but not limited to $17,800.00 in Homeowner's Association fees and past due property taxes;

22   (d) upon MB Equity's default on its obligations, McClure did not personally pay off his assigned

23   obligations, and has not paid the ten-percent (10%) penalty fees on the outstanding amounts owed; (e)

24   Plaintiff was not compensated for the Ruthless Entrepreneur losses; (f) the duties of Defendants MB

25   Equity, McClure and Wallem regarding the lease and/or sale of the Ocean Ridge Condos were

1    completely abandoned by these defendants, and; (g) McClure has not covered eighty-percent (80%) of

2    all monthly losses incurred from the Ocean Ridge Condos project.

3        69.    As a direct and proximate result of these breaches by the defendants, Plaintiff has been

4    damaged in an amount within the jurisdiction of this Court, as alleged herein and in accordance to

5    proof.

6        WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

7                    **SECOND CLAIM FOR RELIEF**
          **(Common Count – Money Had and Received as to All Defendants)**
8
9        70.    Plaintiff hereby realleges and incorporates by reference each and every allegation set

10    forth in paragraphs 1 through 69 of this Complaint.

11        71.    Plaintiff Sandy hereby alleges and claims that Defendants MB Equity, McClure,

12    Wallem, Tarbell, and PJTR owe him money. Such funds include but are not limited to the amount lent

13    on February 12, 2007, the subsequent deposits for the purpose of acquiring commercial property, and

14    the funds deposited into PJTR's escrow account to purchase the Wild Boar.

15        72.    Plaintiff alleges that Defendants MB Equity, McClure, Wallem and Tarbell by and

16    through PJTR received money that was intended to be used for the benefit of Plaintiff, pursuant the

17    parties' understanding, business plan, and for the purchase of the Wild Boar.

18        73.    Plaintiff hereby alleges that such money was not used for the benefit of Plaintiff, and

19    was used to benefit the defendants, and each of them.

20        74.    Defendants MB Equity, McClure, Wallem and PJTR have not given the money to

21    Plaintiff Sandy, despite repeated demands.

22        WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

23                    **THIRD CLAIM FOR RELIEF**
          **(Common Count – Account Stated as to All Defendants)**
24
25        75.    Plaintiff hereby realleges and incorporates by reference each and every allegation set

     forth in paragraphs 1 through 74 of this Complaint.

76.     Plaintiff Sandy alleges and claims that Defendants MB Equity, Tarbell, PJTR, McClure and Wallem owe him money on an account stated, and that these defendants owed him money from previous financial transactions.

77.     Plaintiff hereby alleges that he and Defendants MB Equity, Tarbell, PJTR, McClure and Wallem, by words or conduct, agreed that the amount stated in the account was the correct amount owed to Plaintiff.

78.     Plaintiff further alleges that Defendants MB Equity, Tarbell, PJTR, McClure and Wallem, by words or conduct, promised to pay the stated amount to Plaintiff.

79.     Plaintiff Sandy therefore alleges that Defendant MB Equity, McClure and Wallem have not paid any of the amount owed under this account, and that Defendants Tarbell and PJTR has only $5,000.00 remaining in escrow and has not refunded such amounts as of the date of filing this action.

80.     The amount of money Defendants MB Equity, McClure and Wallem owe under the account is $100,000.00 of principal, with eight-percent (8%) per annum interest, in addition to the ten-percent (10%) interest penalty payment; eighty-percent (80%) of all losses incurred for the Ocean Ridge Condo properties, currently in the amount of $28,293.71 and continuously accruing; subsequent deposits based on promised reimbursement after purchasing the Wild Boar in the amount of $62,298.00, and; Defendant PJTR owes Plaintiff all funds deposited into the escrow account in the amount of $33,199.00 plus lawful interest.

WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF
**(Breach of Covenant of Good Faith and Fair Dealing as to All Defendants)**

81.     Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 of this Complaint.

82.     Plaintiff Sandy hereby alleges and claims that Defendants MB Equity, Tarbell, PJTR, McClure and Wallem violated the duty to act fairly and in good faith.

83.    Plaintiff alleges that Defendants MB Equity, McClure and Wallem entered into a contract, and that Plaintiff had a direct interest in the contract relating to the leasing and purchasing of the Wild Boar by and through Defendants Tarbell and PJTR.

84.    Plaintiff further alleges that he did all, or substantially all of the significant things that the contract required him to do, or in the alternative, that he was excused from having to do those things by the defendants.

85.    Plaintiff additionally alleges that all conditions required for Defendants MB Equity, Tarbell, PJTR, McClure and Wallem's performance had occurred, and that these defendants unfairly interfered with Plaintiff's right to receive the benefits of the contract.

86.    Based thereon, Plaintiff was harmed by Defendants MB Equity, Tarbell, PJTR, McClure and Wallem's conduct in an amount as herein alleged and in accordance to proof.

WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

### FIFTH CLAIM FOR RELIEF
**(Negligence as to All Defendants)**

87.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 86 of this Complaint.

88.    At all relevant times herein, Plaintiff reasonably and completely relied on Defendants MB Equity, Tarbell, PJTR, McClure and Wallem to manage his assets deposited, to properly exercise care in handling such deposits, and to protect his interests with respect to his investments in commercial property investments.

89.    Defendants MB Equity, Tarbell, PJTR, McClure and Wallem failed to exercise reasonable care, skill and diligence in performance of their duties in managing the commercial property business operations, and mismanaged funds deposited into escrow.

90.    Defendants McClure, MB Equity and Wallem negligently, carelessly, and recklessly rendered services as operators and agents to obtain and manage commercial properties with Plaintiff's

investment funds in that they (a) engaged in prohibited "self-dealing" transactions; (b) depleted all cash reserves by making unsound and unauthorized investments at a time when these Defendants knew Plaintiff was substantially exposing himself to personally-guaranteed promissory notes secured by his lenders; (c) failed to perform due diligence and invested in unsuitable and improper investments on Plaintiff's behalf; (d) paid improper and unauthorized fees, commissions, consulting fees, and incurred obligations through false representation and forgery; (e) made personal expenditures unrelated to the commercial real property projects; (f) failed to inform Plaintiff of his potential exposure to litigation by mismanaging and exhausting the Ocean Ridge Condo tenants' deposits without Plaintiff's knowledge; (g) failed to inform Plaintiff regarding Small Business Administration rules and regulations with respect to his ownership rights in MB Equity in an attempt to divest Plaintiff's interests; (h) abandoned all standard of care in relation to managing the sale and/or lease of the Ocean Ridge Condos (i) failed to disclose McClure's involuntary insolvency proceedings and unlawful acts associated therewith; (j) in conjunction with Tarbell and PJTR, failed to disclose, or alternatively misrepresented, the purpose for making deposits into escrow for the Wild Boar purchase; (k) concealed their wrongdoing from Plaintiff by concealing material facts concerning the investments and transactions and misrepresenting the status of the investments and steps taken to allegedly protect Plaintiff's financial and business interests.

91.    As a direct and proximate result of Defendants' negligence, carelessness and recklessness, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000.00.

WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

## SIXTH CLAIM FOR RELIEF
### (Fraud – Intentional Misrepresentation as to all Defendants)

92.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 91 of this Complaint.

93.    At all relevant times herein, Plaintiff alleges that Defendants Wallem, MB Equity and McClure made false representations that harmed him.

94.    In addition to the misrepresentations set forth in the General Allegations of this Complaint and incorporated herein, Plaintiff hereby alleges that McClure represented important facts were true, including but not limited to: (a) on or about February 22, 2007 Plaintiff was informed that MB Equity was in the process of being listed on the OTCBB and that investors were ready to invest equity into the company to renovate hotel properties; (b) on or about April 17, 2007, Plaintiff was informed of two "[d]eals MB Hotels has on the table," consisting of the "Carambola Resort" and "Roxthom Suite" properties and that "[w]e have most of the financed [sic] in place as well as the management;" (c) on or about October 29, 2007, Plaintiff was informed by McClure that all financing for the purchase of the Wild Boar was secured, more specifically: "Deal is done and financing is COMMITTED," Plaintiff was further advised that "100% of the rent and deposits to go towards the down payment when we close on the deal," which, according to McClure, was to occur on December 21, 2007; (d) that the Ocean Ridge Condos were being properly managed and all mortgage bills and associated fees were timely paid; (e) on or about November 2, 2007, Plaintiff was informed by McClure and Wallem that the seller of the Wild Boar, Thomas Hanley, would reimburse the buyers with a lump sum of $200,000.00 upon closing the Wild Boar transaction, and; (f) at all relevant times alleged herein, McClure and Wallem informed Plaintiff that he would hold a fifty-percent (50%) interest in the Wild Boar by and through his ownership interest in MB Equity.

95.    At all times alleged herein, the foregoing representations made by MB Equity, McClure and Wallem were, in fact, false. To wit: (a) Plaintiff alleges that after initially consulting with an attorney to list the company on the OTCBB at or around January 30, 2007, McClure and Wallem took no further measures to have the company publicly traded; (b) Plaintiff further alleges that the purported negotiations to acquire the "Carambola Resort" and "Roxthom Suite" were not undertaken in good faith as claimed by McClure; (c) on October 29, 2007, financing was NOT secured for the

1    purchase of the Wild Boar and the transaction was ultimately cancelled due to a funding gap; (d) as of

2    October 2007, McClure and Wallem misrepresented facts relating to their management of the Ocean

3    Ridge Condos, including but not limited to their failure to make mortgage payments after November

4    17, 2007, and wrongfully retaining the tenants' security deposits on and after January 2008; (e) on or

5    about February 2008, Plaintiff was informed that Wild Boar owner and seller, Thomas Hanley, was

6    not able to make a lump sum reimbursement in the amount of $200,000.00 after closing the Wild Boar

7    transaction, and was only able to make monthly payments to the buyers, and; (f) on or about January

8    29, 2008, Plaintiff was informed through defendants' counsel that he must assign his MB Equity

9    interest to secure the SBA loan to purchase the Wild Boar, thereby eliminating Plaintiff's fifty-percent

10   (50%) ownership interest in MB Equity as a matter of law. Plaintiff hereby alleges that at all relevant

11   times herein, Defendants McClure, Wallem, Tarbell, and PJTR had knowledge of such SBA

12   requirements, and misrepresented these facts up to and until the eve of closing the Wild Boar

13   transaction.

14         96.    At all relevant times herein, Plaintiff alleges that Defendants McClure, Wallem, MB

15   Equity, Tarbell, and PJTR knew that the foregoing representations were false when made, or

16   alternatively made such representations representation recklessly and without regard for its truth.

17         97.    Plaintiff further alleges that Defendants McClure, Wallem, MB Equity, Tarbell, and

18   PJTR intended that Plaintiff rely on such representations, and Plaintiff reasonably relied on these

19   defendants' representations when depositing funds into MB Equity's bank account and PJTR's escrow

20   account.

21         98.    Based thereon, Plaintiff was harmed, and Plaintiff's reliance on the representations

22   made by Defendants McClure, Wallem, MB Equity, Tarbell, and PJTR was a substantial factor in

23   causing his harm in excess of $500,000.00 as herein alleged and in accordance to proof.

24         99.    Plaintiff is informed and believes, and based thereon alleges, that the actions and

25   conduct of Defendants were willful, wanton, malicious and fraudulent, and made in conscious

1    disregard of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary

2    damages against said Defendants.

3         WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

### SEVENTH CLAIM FOR RELIEF
#### (Fraud – Negligent Misrepresentation as to All Defendants)

100.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 99 of this Complaint.

101.    Plaintiff hereby alleges that at all relevant times herein, the misrepresentations set forth in Plaintiff's Sixth Claim for Relief, and incorporated as though fully set forth herein, constitutes representations of important facts Defendants claimed as true; that Defendants' representations were, in fact, not true, and; that Defendants had no reasonable grounds for believing that the representations were true when they made such representations.

102.    Plaintiff further alleges that these defendants, and each of them, intended that Plaintiff rely on these representations, Plaintiff reasonably relied on such representations, and Plaintiff was harmed. Consequently, Plaintiff's reliance on the representations made by Defendants McClure, MB Equity, Wallem, Tarbell, and PJTR was a substantial factor in causing Plaintiff's harm, in excess of $500,000.00 as herein alleged and in accordance to proof.

103.    Plaintiff is informed and believes, and based thereon alleges, that the actions and conduct of Defendants were willful, wanton, malicious and fraudulent, and made in conscious disregard of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary damages against said Defendants.

     WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

### EIGHTH CLAIM FOR RELIEF
#### (Fraud – Concealment as to All Defendants)

104.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 103 of this Complaint.

105.    Plaintiff hereby alleges that at all relevant times herein, Defendants McClure and Wallem were business partners with Plaintiff and held joint interests in Defendant MB Equity and its commercial operations. Plaintiff further alleges that Defendant Tarbell and PJTR, as a Realtor and principal of its escrow account, owes fiduciary duties to disclose material terms to all parties in a real estate transaction.

106.    In addition to the misrepresentations generally alleged, and that which is alleged in Plaintiff's Sixth and Seventh Claims for Relief duly incorporated herein, Defendants McClure, Wallem, Tarbell, and PJTR intentionally failed to disclose the following important facts to Plaintiff: (a) that McClure was subject to an involuntary insolvency proceeding in United States Bankruptcy Court in the State of Maine from August 15, 2007 through November 28, 2007; (b) that Plaintiff's deposits into Defendant PJTR's escrow account would be applied towards unpaid rent for the Wild Boar; (c) that Plaintiff would be required to give up his interest in MB Equity in order for the Wild Boar transaction to timely close; (d) that Defendants would unilaterally amend the Commercial Lease and Purchase Agreement without Plaintiff's consent; (e) that Tarbell and PJTR were involved with the Commercial Lease without disclosure to Plaintiff; (f) that McClure and Wallem were using MB Equity funds provided by Plaintiff for personal expenses; (g) that Plaintiff's signature was forged on a promissory note in the favor of AAA Energy Services; (h) that McClure and Wallem stopped making all payments on the Ocean Ridge Condos after November 2007; (i) that McClure and Wallem were commingling tenant security deposits with MB Equity capital funds provided by Plaintiff; among other intentionally concealed facts that Plaintiff reserves to plead upon discovering further information.

107.    At all relevant times alleged herein, Plaintiff did not know of such concealed facts, and the defendants concealed such facts with the intent to deceive Plaintiff into transferring more funds to Defendants' respective bank accounts.

108.    Plaintiff hereby alleges that he reasonably relied on these Defendants' deceptions and

that he was harmed. Consequently, Plaintiff's reliance on the deceptions made by Defendants McClure, MB Equity, Wallem, Tarbell, and PJTR was a substantial factor in causing Plaintiff's harm, in excess of $500,000.00 as herein alleged and in accordance to proof.

109. Plaintiff is informed and believes, and based thereon alleges, that the actions and conduct of Defendants were willful, wanton, malicious and fraudulent, and made in conscious disregard of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary damages against said Defendants.

WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

### NINTH CLAIM FOR RELIEF
**(Fraud – Promise with No Intent to Perform as to All Defendants)**

110. Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 109 of this Complaint.

111. Plaintiff hereby alleges that at all relevant times herein, the allegations set forth in Plaintiff's Sixth Claim for Relief, and incorporated as though fully set forth herein, constitute promises made to Plaintiff that were important to the transactions and deposit of funds to Defendants' respective bank accounts. Plaintiff further alleges the following as important promises made to Plaintiff that were important to such transactions: (a) the Loan Contract attached as Exhibit 2 to this Complaint; (b) the promise to obtain capital investors in order to list MB Equity on the OTCBB; (c) the promise that Plaintiff would receive a reimbursement from Thomas Hanley's $200,000.00 lump sum reimbursement; (d) the promise that Defendants MB Equity and, *inter alia*, McClure and Wallem would cover eighty-percent (80%) of all losses related to the Ocean Ridge Condos; (e) the promise that Plaintiff would hold a fifty-percent (50%) ownership interest in Defendant MB Equity; (f) the promise that all of Plaintiff's escrow deposits would be applied to purchasing the Wild Boar; among other important promises that Plaintiff reserves to plead upon discovering further information.

112. At all times alleged herein, Defendants Wallem, McClure, MB Equity, Tarbell, and

PJTR did not intend to perform the foregoing promises when they made them and these defendants intended that Plaintiff rely on such promises so that he would deposit more funds into their respective bank accounts.

113.    Plaintiff hereby alleges that he reasonably relied on these Defendants' promises and such promises were, in fact, not performed thereby causing harm. Consequently, Plaintiff Sandy's reliance on the false promises made by Defendants McClure, MB Equity, Wallem, Tarbell, and PJTR was a substantial factor in causing Plaintiff's harm, in excess of $500,000.00 as herein alleged and in accordance to proof.

114.    Plaintiff is informed and believes, and based thereon alleges, that the actions and conduct of Defendants were willful, wanton, malicious and fraudulent, and made in conscious disregard of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary damages against said Defendants.

WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

## TENTH CLAIM FOR RELIEF
### (Constructive Fraud as to All Defendants)

115.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 114 of this Complaint.

116.    Plaintiff hereby alleges that at all relevant times herein, Defendants McClure and Wallem were business partners with Plaintiff and held joint interests in Defendant MB Equity and its commercial operations. Plaintiff further alleges that Defendant Tarbell and PJTR, as a Realtor and principal of its escrow account, owes fiduciary duties to disclose material terms to all parties in a real estate transaction.

117.    Plaintiff hereby specifically re-alleges and incorporate the allegations set forth above in paragraphs 88 through 90 and 106 through 108 of this Complaint, as though fully set forth herein.

118.    Plaintiff further alleges that Defendants, and each of them, knew, or through the

exercise of ordinary care, should have known that they would be unable to carry out their promises, and failed to fully disclose material facts, which directly and proximately caused Plaintiff to deposit funds into the respective bank accounts of Defendant MB Equity and PJTR.

119.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff was harmed in excess of $500,000.00 as herein alleged and in accordance to proof.

120.    Plaintiff is informed and believes, and based thereon alleges, that the actions and conduct of Defendants were willful, wanton, malicious and fraudulent, and made in conscious disregard of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary damages against said Defendants.

WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

## ELEVENTH CLAIM FOR RELIEF
### (Professional Negligence as to Defendants Tarbell and PJTR)

121.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 122 of this Complaint. Plaintiffs specifically incorporate herein, as though set forth fully, all of the allegations contained and incorporated in paragraphs 117 through 120 of this Complaint.

122.    Plaintiff alleges that Defendants Tarbell and PJTR owed fiduciary and professional duties of care to Plaintiff as a Realtor and principal real estate broker licensed to practice in and for the States of Maine and New Hampshire, with the authority to hold and distribute escrow funds in trust for parties involved in the purchase and sale of real estate.

123.    Plaintiff therefore alleges that Defendants Tarbell and PJTR breached such fiduciary duties and the professional standard of care as required under the laws of New Hampshire, by: (a) inducing Plaintiff into depositing funds into PJTR's escrow account without disclosing to him that the funds may be applied to unpaid rent; (b) preparing and causing addendums to be executed with knowledge of Plaintiff's lack of knowledge or consent – in fact, Defendants Tarbell and PJTR were

1   aware that Plaintiff Sandy's name was scratched out of such addendums; (c) preparing an addendum

2   allocating $5,000.00 of the initial purchase deposit to pay for rent on the Wild Boar, and; (d) failing to

3   promptly resolve or cure the acts of professional negligence pleaded herein.

4       124.    Plaintiff alleges that such multiple breaches of Defendants Tarbell and PJTR's

5   professional duty actually and proximately caused the resulting damages and injuries suffered by

6   Plaintiff, constituting actual losses to Plaintiff.

7       125.    As a direct and proximate result of the negligence as hereinabove alleged, Plaintiff was

8   harmed in an amount within the jurisdiction of the Court as herein alleged and in accordance to proof.

9       126.    Plaintiff is informed and believes, and based thereon alleges, that the actions and

10  conduct of Defendant was willful, wanton, malicious and fraudulent, and made in conscious disregard

11  of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary damages

12  against said Defendant.

13      WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

14  ### TWELFTH CLAIM FOR RELIEF
    **(Breach of Fiduciary Duty as to All Defendants)**

15      127.    Plaintiff hereby realleges and incorporates by reference each and every allegation set

16  forth in paragraphs 1 through 126 of this Complaint.

17      128.    Plaintiff hereby alleges that at all relevant times herein, Defendants McClure and

18  Wallem were business partners with Plaintiff and held joint interests in Defendant MB Equity and its

19  commercial operations. Plaintiff further alleges that Defendants Tarbell and PJTR, as a Realtor and

20  principal of its escrow account, owe fiduciary duties to all parties involved in a real estate transaction.

21  Consequently, these defendants owe fiduciary duties to act with the utmost good faith in the best

22  interests of Plaintiff.

23      129.    Plaintiff further alleges that Defendants McClure and Wallem, *inter alia*, failed to act

24  as reasonably careful business partners would have acted under the same or similar circumstances, and

25

1    that Defendants Tarbell and PJTR failed to act as a reasonably careful Realtor would have acted in

2    handling the Wild Boar purchase and sale.

3         130.    As a direct and proximate result of the conduct hereinabove alleged, Plaintiff was

4    harmed, and the defendants' conduct was a substantial factor in causing such harm, in excess of

5    $500,000.00 as herein alleged and in accordance to proof.

6         131.    Plaintiff is informed and believes, and based thereon alleges, that the actions and

7    conduct of Defendant was willful, wanton, malicious and fraudulent, and made in conscious disregard

8    of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary damages

9    against said Defendant.

10        WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

11    ### THIRTEENTH CLAIM FOR RELIEF
**(Intentional Infliction of Emotional Distress as to Defendants Wallem, McClure, MB Equity)**

12        132.    Plaintiff hereby realleges and incorporates by reference each and every allegation set

13    forth in paragraphs 1 through 131 of this Complaint.

14        133.    Plaintiff is informed and believes, and based thereon alleges that the fraudulent,

15    conspiratorial, and unlawful acts alleged in this Complaint committed by Defendants McClure and

16    Wallem, and each of them, against Plaintiff constitutes extreme and outrageous conduct by these

17    Defendants with the intention of causing, or with the reckless disregard of the probability of causing,

18    emotional distress.

19        134.    Plaintiff further alleges that he suffered, and continues to suffer, severe and extreme

20    emotional distress which was actually and proximately caused by Defendants' outrageous conduct.

21    Such extreme emotional distress includes, but is not limited to, physical illness, insomnia, heart

22    palpitations, thereby causing loss of wages, among other extreme distress due to the prospect of losing

23    hundreds of thousands of dollars and potential insolvency proceedings

24        135.    As a direct and proximate result of the intentional infliction of emotional distress as

25

hereinabove alleged, Plaintiff has been damaged, and continues to suffer damages, including emotional and physical distress, in an amount in exceeding $500,000.00 as herein alleged and in accordance to proof.

136.    Plaintiff is informed and believes, and based thereon alleges, that the actions and conduct of MB Equity, McClure and Wallem was willful, wanton, malicious and fraudulent, and made in conscious disregard of Plaintiff's rights, and Plaintiff is thus entitled to an award of punitive and exemplary damages against said Defendants.

WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

## FOURTEENTH CLAIM FOR RELIEF
### (Unjust Enrichment as to All Defendants)

137.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 136 of this Complaint.

138.    By means of material misrepresentations and misconduct, Defendants, and each of them, induced Plaintiff to enter into multiple transactions involving large sums of money to the detriment of Plaintiff.

139.    Plaintiff hereby alleges that Defendants McClure, MB Equity, and Wallem received a benefit from Plaintiff, as set forth in Exhibit 2, and they further received deposits of Plaintiff's funds in excess of $250,000.00 which Plaintiff continues to pay interest and costs to his lenders for such encumberances. Plaintiff further alleges that Defendant Tarbell and PJTR wrongfully retained and improperly distributed $33,199.00 of Plaintiffs funds deposited into the PJTR escrow account for the purpose of purchasing the Wild Boar.

140.    Plaintiff further alleges that Defendants MB Equity, Mclure, Wallem, Tarbell and PJTR retained such benefit at the expense of Plaintiff, who is now required to pay interest on monies lent under the promise that such funds would be returned, and therefore alleges that the benefits received by the defendants were retained unjustly to the detriment and expense of Plaintiff.

1    141.    Based thereon, Plaintiff alleges that restitution and equitable remedies, including but

2    not limited to liens and/or constructive trusts imposed against the real or personal property the

3    defendants obtained with such unjustly retained benefits, is just and proper in this matter.

4    WHEREFORE, Plaintiff prays that judgment be entered as hereinafter set forth.

5    ### PRAYER FOR RELIEF

6    WHEREFORE, Plaintiff Barrie D. Sandy prays for judgment and relief against

7    Defendants as follows:

8    1.    For damages in favor of Plaintiff Sandy and against Defendants McClure, Wallem, MB

9    Equity, Tarbell, and PJTR jointly and severally in the amount of $500,000.00 plus such additional

10    amounts as are proved at trial;

11    2.    For exemplary and punitive damages as pleaded herein;

12    3.    For costs of suit and reasonable attorneys' fees, if appropriate, and;

13    4.    For such other relief as the Court may deem appropriate.

Respectfully submitted,

Dated: June 19, 2008

TREVOR G. JACKSON
Attorney for Plaintiff Barrie D. Sandy

1

## DEMAND FOR JURY TRIAL

2      Plaintiff Barrie D. Sandy hereby demands a trial by jury of all claims subject to a jury trial.

3

4                                          Respectfully submitted,

5

6    Dated: June 19, 2008

7                                          TREVOR G. JACKSON
                                           Attorney for Plaintiff Barrie D. Sandy

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT  1

Fax Memo

Date:  July 2, 2006

Attn:  Mark McClure

From:  Barrie Sandy

Re:  License Agreement

---

3 pages including cover page

See signed license agreement.  I've listed states we talked about for defining region.
Have questions regarding renewal process and will discuss with you later.  Will email
notes I took while reviewing infomercial tomorrow.  With God's blessing, I'm looking
forward to making some serious money with the MMI team, as well as helping others
make positive change in their lives through your DVDs, books, seminars, coaching, and
anything else we can come up with....might have an idea or two on that one.  Let's talk
on Monday.



# m a r k   m c c l u r e   i n t e r n a t i o n a l

## Street Smart Entrepreneur License Agreement

Mark McClure International (hereby referred to as "MMI") agrees to enter into a licensing agreement with ___Barrie Sandy___ on this day, _29th of June_ 2006.

MMI agrees to give ____Barry Sandy____ the following below in return for a one time license fee of $4,500 due and payable as follows:

Via check or money order on or before July 3rd, 2006 made out to "Mark McClure" and sent to: 44 Cumberland Rd, Gorham, Maine 04038

In exchange for said licensing fee, Licensee shall receive the following:

- Exclusive marketing of MMI's infomercials, products, seminars/events for the states Arizona and California, NEVADA, UTAH, COLORADO, ARIZONA, NEW MEXICO, TEXAS AND HAWAII.

- Three year license, which may be sold or transferred with prior written approval from MMI and a 15% transfer fee (said percentage shall be based on the sales price of the license).

- Licensee shall be granted this three year licensee on the following parameters:

  o Must run commercial at least twice a week in your territory on either NBC, CBS, ABC, or Fox regional channel, however, Licensee may utilize other networks over and above after requirement met. Initial media plan frequency is negotiable. Re-investment in a minimum media plan will be funded by a reasonable portion of revenues generated from previous campaigns.

  o During November 1st-January 31st must run a minimum of three times weekly, subject to the level and availability of revenue generated from previous campaigns.

  o Licensee agrees to use MMI's media buyer exclusively during the life of the license.

  o Licensee may not edit commercial in any way, shape or form with the exception of adding a unique toll free number.

  o Licensee may use MMI or its likeness in marketing the DVD via other media avenues with PRIOR approval of MMI. Said marketing may ONLY be done in licensee's territory. MMI agrees to reply within 24 hours relative to the approval of the use of other media.

o  The database of purchasers is the sole ownership of MMI and can only be used by licensee in coordination with MMI on joint ventures such as seminars, boot camps, etc. In return for this sole ownership of the list, MMI agrees to include the Licensee, via a split revenue or other financial benefit, in any up-sell opportunities or joint ventures utilizing the list of purchasers for the Licensee's territory, including seminars, etc.

o  If MMI feels that the territory of Licensee is being under-utilized, MMI shall have the right to run additional infomercials on it's own with no compensation paid to Licensee. MMI may NOT run any infomercials in the same day or time slots of Licensee, and Licensee would not lose their license for that territory. Under-utilization must first be discussed with the licensee, and the licensee must be provided an opportunity to expand his/her media investment prior to MMI placing and running any infomercials inside the Licensee's territory.

o  If Licensee fails to meet the minimum ad run requirements twice in a 30 day period, then MMI shall have the right to revoke license and resell the territory, assuming sufficient revenues were generated and are available from previous media campaigns to fund the minimum media plan as described.

• One copy of commercial, 100% formatted for TV studio parameters shall be given to licensee. Licensee shall be responsible for copying duplicate tapes for stations and distribution to stations. However, MMI will set Licensee up with our partner media company who can handle the duplication and distribution to stations. Media partner may charge a nominal fee for this.

• MMI shall be responsible for complete fulfillment of product and provide 24/7 customer service operators 365 days a year, including the processing of orders and shipping to customers. MMI shall be financially and physically responsible for this process.

• No charge back responsibilities born by licensee.

• Licensee shall be paid 50% of all product sales less the cost of the DVD (which is $6.00 and shall be split 50/50 by licensee and MMI).

To Be Revised

• Licensee shall receive said 50% compensation on a weekly basis via check or bank transfer. Licensee shall be responsible for all of their own taxes, both State and Federal. However, MMI includes licensees in a national campaign and there is 100% approval for inclusion by the Licensee shall receive a pro rated percentage based on the number of participants. For example, 5 licensees and MMI would equate to 6 and a 16.6% distribution to licensee.

Mark McClure
Its:

Barrie Sandy

Date  June 29, 2006        Date    June 29, 2006

EXHIBIT  2

## Loan Contract
### February 11, 2007

This document serves as a contract between Barrie Sandy and Mark McClure. Mr. Sandy is providing a loan of $100,000 to MB Equity Partners, an LLC formed in the state of Delaware whose partners/membership is comprised of Barrie Sandy and Mark McClure. The use of these funds is strictly intended for the purpose of launching a business venture to be known as MB Hotels, a development of a chain of upscale boutique hotels. It is agreed that the entire amount of the loan and interest for that loan will be reimbursed to Mr. Sandy as soon as earliest funding is secured. All interest payments will be kept current and paid on time by MB Hotels. As soon as additional funds are raised, full reimbursement of loan and all outstanding interest charges will paid immediately to Mr. Sandy. The name components of this venture could change; however, the ownership structure will remain as 50% Barrie Sandy and 50% to Mark McClure. A full deposit of the funds will be made on or before February 12th, or this agreement is NULL AND VOID. Mr. McClure is to provide a legally and financially acceptable business plan to Mr. Sandy and all institutions requiring the plan in order to fulfill their specified and/or contracted responsibilities by March 5th.

If for any reason necessary funding is not raised to replace loan from Barrie Sandy and all related interest charges, Mark McClure agrees to accept full responsibility for pay-off of loan and all interest charges. If funding from MB Hotels is no longer available for payment of monthly interest payment, responsibility of payment will immediately defer to Mark McClure who will keep all monthly interest payments current and on time. If responsibility of payment should defer to Mark McClure and if any payment is delinquent, then a penalty of 10% of delinquent loan amount will be assessed to the unpaid amount.

In addition to statements above, Mark McClure also agrees to honor previous agreements made with licensee and business partner Barrie Sandy.

Licensee agreement between Mark McClure and Barrie Sandy for the sale of "The Ruthless Entrepreneur" DVD, book, and related business activities.

Reimbursement of unpaid interest charges for $40,000 loan designated for purchase of condo in Portland, Maine. (HAVE BEEN PAID IN FULL)

Fulfillment of leasing and/or sale of two condos in Portland, Maine purchased in partnership and agreement to assume 80% of unpaid monthly/annual debt.

_____
Mark McClure

February 12th, 2007
Date

_____
Barrie Sandy

_____
Date

EXHIBIT  3

*Original/Active
11/16/07 - 11/16/08* KH

## AGREEMENT OF COMMERCIAL LEASE

AGREEMENT OF LEASE made this 16th day of November 2007, by and between Flathead Realty Group, LLC, whose address is PO Box 1380, Intervale NH 03845 for itself and its successors, assigns, and legal representatives, hereinafter referred to as LANDLORD, and MB Equity Partners, LLC, and Paula Wallem, whose address is 147 Ridge Rd, Portland, Maine 04103, hereinafter referred to as TENANT.

WITNESSETH: The parties hereto, for the consideration hereinafter mentioned, covenant and agree as follows:

1. Description of Premises: The landlord hereby leases unto the Tenant the following described premises: The Wild Boar Tavern/Restaurant/Inn and residence, in its entirety, located at 3465 White Mountain Highway in North Conway, New Hampshire. This space is to be used by the Tenant as a tavern, restaurant and inn only.

2. Term: To have and to hold the same premises with appurtenances thereto for the term of one (1) year beginning November 15, 2007 through November 15, 2008, with a one (1) year Option to Renew per paragraph 3.

3. To Renew: This lease agreement may, at the mutual agreement of the Tenant and Landlord, be extended for a negotiated term, subject to re-negotiation of rental cost. The Tenant must notify Landlord in writing ninety days prior to expiration of this lease, of Tenant's intent to renew. +

   Tenant shall have the exclusive right to purchase property during the first year of lease term at a price of $1.025 million. Monetary credit towards purchase price explained in detail under LEASE PAYMENTS.

4. Obligation of Tenant:

   RENT: Rent for this term shall be $95,200, payable in monthly installments of $8,000.00 on the fifteenth (15th) day of each calendar month, with payment prorated for November 18 – December 15 at $7,200.00 representing 12 days of occupancy in November 2007. All rent payments are subsequently due on or before the 15th of the month to avoid late fees.
   ACQUISITION FEE: The Tenant shall provide Landlord an Acquisition Fee in the amount of $8,000.00 upon signing the lease. This fee is non-refundable. Should Buyer purchase the property and the Transfer of Title take place during calendar year 2008, this fee will be credited to the Buyer/Tenant and applied towards the purchase price.
   Upon termination of the premises, the entire space must be thoroughly cleaned. After inspection by LANDLORD or LANDLORD'S agent, appropriate charges may be made to TENANT for any cleaning required, any unpaid sums due under the lease, damages or repairs to the premises or its contents beyond reasonable wear and tear, any unpaid rent, cost of re-renting if applicable, attorney fees and courts costs incurred in any eviction proceeding against tenant, if such costs exceed $8,000.00. Tenant agrees to pay such excess amount upon written demand plus all costs incurred in collection.
   RENT PAYABLE TO: Flathead Realty Group, LLC, whose address is PO Box 1380, Intervale NH by mail (envelope must be postmarked on or before the 15th of the month to avoid late fees) on or before the 15th of the month. Rent may be paid by personal check, business check, or bank check; no cash.

KH

LATE FEES: Rent received later than the 20th of the month will incur a late fee of $6.00 a day until paid.

RETURNED CHECK FEE: Tenant will pay a $35 fee for each check returned due to insufficient funds, Tenant will pay late fees at $6 a day beginning from the 21st of the month in which rent was due, until paid.

LEASE PAYMENTS: Rental payments for November and December 2007 shall be credited towards the purchase price if transfer of title takes place in calendar year 2008. Otherwise, 50% of all rents paid on time will be credited towards the purchase price, if transfer of title takes place on or before January 31, 2008.

TRAINING: TENANT will pay LANDLORD $8,000 upon signing the lease, for up to two (2) weeks of training from November 18, 2007, through December 2, 2007, and give LANDLORD onsite lodging during this period. Should TENANT purchase the property on or before January 31, 2008, this fee will be applied towards the purchase price.

5. Provisions for Expenses: In addition to rent payable under Article 4 the Tenant shall pay all utilities for the property including heat, A/C, electricity, water, sewer, plowing/sanding, mowing, landscaping, telephone, cable, fire protection and security; all service contracts & accounts to be in name of Tenant.

6. Rubbish Removal - Rubbish and trash shall not be permitted to accumulate and shall be disposed of in a proper receptacle. It shall be the Tenant's responsibility to remove rubbish and trash to the appropriate landfill or recycling facility in a timely manner. TENANT agrees never to place any trash, boxes, or any items in the yard or anywhere outside the leased premises where visible. Any items left there, for even a short period of time shall be cause for removal and an automatic $55 charge will be incurred by TENANT to cover LANDLORD'S cost to manage this problem, remove the items and overhead for processing. Tenant will comply with all health, safety, rules, codes, and regulations enforced by appropriate departments on the town and state levels.

7. Right to Enter: The Tenant shall permit the Landlord at all usual, proper times to enter the premises for the purposes of inspection or sale or to make repairs, both routine and emergency. TENANT agrees to keep a valid working key with the LANDLORD at all times.

8. Indemnification - Tenant agrees to indemnify and hold harmless Landlord from any and all damages arising from the action, inaction, negligence or intentional acts of the Tenant or any of Tenants invitees, and for any loss or damage to the premises, excluding normal wear and tear, including, but not limited to the cost of defending any action arising from action, inaction, negligence or intentional acts of Tenant or any of Tenants invitees. Tenant shall be responsible for obtaining and paying the cost of any renters, employee, or other insurance necessary to provide coverage for damage to tenant's person or property. The LANDLORD shall be held free and harmless from liability for loss or damage to property of the TENANT in the premises by fire, extended coverage perils, vandalism and malicious mischief if and to the extent actually insured against, whether or not such loss or damage be the result of the negligence of the LANDLORD, its employees or agents.

All property of every kind on the Leased Premises shall be at the sole risk of the TENANT. TENANT shall at its cost maintain public liability and property damage insurance with liability limits of not less than $1,000,000 bodily injury for each occurrence and a minimum of a $2,000,000 general aggregate if applicable, and property damage limits of not less than $1,000,000 per occurrence, insuring against all

KH

liability of TENANT and its authorized representatives arising out of and in connection with TENANT'S use or occupancy of the Leased Premises. TENANT at its cost shall maintain and insure all its fixtures, contents and improvements on or about the Leased Premises, a policy of fire, extended coverage, and vandalism to the extent of at least eighty (80%) percent of their actual cash value.

The TENANT shall furnish to the LANDLORD upon signing the lease and then annually, a certificate of insurance which indicates all coverages required under this lease and furthermore, names the LANDLORD as an additional insured as respects general liability coverages. This certificate of insurance shall also contain a minimum 30-day notice of cancellation to the certificate holder(s) and the additional insureds.

TENANT will carry Workers Compensation Insurance for their employees based upon the laws of the State of New Hampshire, if applicable to their operation, for the term hereof. Tenant will carry liquor liability with limits of not less than $1,000,000. TENANT shall cause a copy of this insurance to be sent to LANDLORD annually.

9. Preparation of Premises: the Landlord shall, at its own expense, take the necessary steps to exterminate all vermin, such as roaches, water bugs, rats and mice, and it shall be the duty of the TENANT, or others in the employ of the TENANT, to carry out any subsequent steps necessary to eliminate such vermin during the term of the lease.

Notwithstanding any provisions in this contract pertaining to the responsibility of the Landlord for the maintenance and repair of premises, it is understood and agreed that the Landlord shall not assume the cost and responsibility for repair of any damage to premises occasioned by the negligence or willful act of the Tenant or its employees or visitors, this being the Tenant's obligation.

10. Janitorial Services: The Tenant shall furnish janitorial services for the within demised premises.

11. Signs & Merchandise Display: The Tenant agrees to adhere to all Conway signage rules and regulations as well as noise regulations

12. Failure to Maintain: If the TENANT does not maintain the premises and all appurtenances thereto as herein before specified in good repair, reasonable wear and tear excepted, and/or does not perform all other services as required herein, the LANDLORD shall notify the TENANT in writing in reference thereto by registered mail, return receipt. If, within fifteen (15) days after such notice has been received by the TENANT, said TENANT failed to take steps to remedy the grievances specified, the LANDLORD may contract to have said grievances remedied and the TENANT assumes and agrees to pay the cost thereof.

LANDLORD is responsible for: foundation, roof, sub flooring, bearing and exterior walls (excluding glass & screens in doors and windows), electrical systems servicing up to but not beyond circuit breakers, and exterior window frames. TENANT is responsible for: exterior signs, glass & screens in windows, exterior door and door frame, flooring, interior walls, and bathroom plumbing and light fixtures.

Notwithstanding the foregoing, TENANT shall be responsible for any repairs of the building whether structural or non-structural made necessary by the TENANT, its agents, contractors or employees.

*KH*

13. Assignment or Sublease: This agreement shall not be assigned by the Tenant without the prior written consent of the Landlord, nor shall the premises be sublet in whole or in part without such consent, which will not be unreasonably withheld.

14. Fixtures: All fixtures or equipment of whatever nature owned by the Tenant and which have been attached to the demised premises remain the personal property of the Tenant and may be removed by the Tenant at its discretion but not later than the date of termination of this lease or the termination of any extension, renewal, tenant-at-will or tenant-at-sufferance occupancy thereof. The Tenant shall repair promptly any damage to the demised premises caused by such removal, in a workman-like manner.

Tenant is responsible for upkeep and repairs, maintenance of building and contents, to include all items listed on inventory list, all coolers, refrigerators, stoves and appliances.

15. LIEN ON TENANT'S PROPERTY: The LANDLORD shall have a lien, in the nature of a security interest created under the NH Commercial Code (RSA 382-A) with a private power of sale, upon all of the goods, wares, chattels, fixtures, and furniture of the TENANT that may be in or upon the leased premises, to secure the payment of the aforesaid rent. Said lien shall be deemed a security interest pursuant to the provisions of the Uniform Commercial Code (UCC) and shall be perfected immediately upon the LANDLORD recording a notice of lease in the Carroll County Registry of Deeds and by recording UCC Financing Statements in the Officer of the Town of Conway and the NH Secretary of State. Such lien shall be enforced on the nonpayment of any installment of rent by the taking and selling of any such property in a manner permitted by the UCC. The aforesaid lien and any right of sale shall be in addition to, and not substitution for, all other rights and remedies which the LANDLORD may have hereunder.

16. Surrender of Premises: The Tenant shall, at the end of the term, quit and surrender the demised premises in as good order and condition as when received, natural wear and tear and damage by the elements, including fire, excepted, and shall pay the rent as above stated for such further time as the Tenant may hold the same.

17. Alterations: All alterations and/or changes in the building must receive prior written consent of the Landlord, and must meet all requirements for building, fire and safety codes as must then be in effect. Any movable installations made at the expense of the Tenant shall be considered the property of the Tenant and may be removed from the premises at any time as provided in paragraph 14 hereof. Alterations shall be at the Tenant's expense. One key will be give to TENANT at the time of occupancy. Alterations or replacement of locks or installation of bolts, knockers, peepholes or other attachments to the interior or exterior of any door requires the prior consent of the LANDLORD. The TENANT is required to furnish the LANDLORD with 3 keys for any new locks installed, immediately upon installation. A $65 fee will be assessed for any lockout after 5pm or before 9:00am

18. BUSINESS INTERRUPTION INSURANCE: TENANT shall carry Business Interruption Insurance, so that rent can be paid in the event that the demised premises, or any part thereof, during the term hereof, shall be destroyed or damaged by fire or other casualty, so that the same shall be thereby rendered unfit for use and occupation by TENANT. TENANT shall cause a copy of this insurance to be sent to LANDLORD annually.

The minimum rent and other charges to be paid by TENANT under this lease shall not abate or be reduced proportionately unless LANDLORD shall have given notice to TENANT of its intent to terminate lease by virtue of damage. If, after the

*KH*

commencement of the term of this lease, and prior to the expiration thereof, the premises shall be substantially damaged by fire or casualty, the risk of which is covered by LANDLORD, LANDLORD may expend so much as may be necessary of such net amount to restore, to the extent originally constructed by LANDLORD, so much of the Premises as were originally constructed by LANDLORD to substantially the same condition in which the Premises were in at the time of such damage. LANDLORD shall not be responsible for delay which may result from any cause beyond its reasonable control, should the net amount of insurance proceeds available be insufficient to cover the cost of restoring the premises, in the reasonable estimate of LANDLORD, LANDLORD may, but shall have no obligation to, supply the amount of such insufficiency and restore the premises with all reasonable diligence, or LANDLORD may terminate this lease by giving notice to TENANT not later than a reasonable time after LANDLORD has determined the estimated net amount of insurance proceeds available to LANDLORD and the estimated cost of such restoration.

19. Breach of Conditions:  In the event that the Tenant breaches any provision of this agreement, the Tenant shall be responsible for any and all costs of collection, including reasonable attorney's fees, incurred by the Landlord enforcing the provisions of this agreement.

20. Acceleration - In the event of a material breach of this rental agreement, Landlord shall have the right to accelerate the Rent by demanding the unpaid balance of the total amount of the Rent, and any penalties or late fees due and payable upon making the demand.

WITNESS the hand and seals of the parties hereto on day and year first written above:

Witness

_M. Antall to both_

The Wild Boar Tavern

by_____  11/16/07
Thomas Hanley/Date

by_____  11/16/07
Karen Hanley/Date

_____

Mark McClure

_____

by_____
MB Equity Partners, LLC/Date

by_____
Paula B Wallem/Date

THIS LEASE INCLUDES DRAFT BEER SYSTEM
AND FURNITURE FIXTURES & EQUIPMENT listed
ON INVENTORY SHEET     TCH. KH

EXHIBIT  4

## PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
### New Hampshire Association of REALTORS® Standard Form



1. **THIS AGREEMENT** made this _____ 12th _____ day of _____ October _____, 20 07 between
   _____ Thomas and Karen Hanley _____ ("SELLER")
   of _____ 3645 White Mountain Hwy _____, City ___ North Conway ___ County of ___ Carroll ___
   State NH Zip ___ 03860 ___ and _____ Paula Wallem and/or assigns _____ ("BUYER")
   of _____ 147 Ridge Road _____, City ___ Portland ___ County of _____,
   State ME Zip _____,

2. **WITNESSETH:** That SELLER agrees to sell and convey, and BUYER agrees to buy certain real estate located in City/Town
   of _____ North Conway _____ known as or described as Wild Boar Restaurant and Tavern
   _____

   County ___ Carroll ___ Book ___ 2366 ___ Page ___ 556 ___ Date _____ **("PROPERTY")**.

3. The **SELLING PRICE** is _____ one million twenty five thousand dollars _____ Dollars $ ___ 1,025,000.00 ___
   DEPOSIT, receipt of which is hereby acknowledged in the form of _WIRE transfer on 10/15/07_ , is to
   be held in an escrow account by _Prudential JT Realty_ **("ESCROW AGENT")**, in the sum of $ ___ 10,000.00 ___
   ADDITIONAL DEPOSIT will be paid on or before _NA_ , in the sum of $ _NA_
   CASH, CERTIFIED CHECK OR BANK DRAFT will be paid on the date of transfer of title in the sum of $ ~~1,015,000.00.~~ *$715.00*

4. **DEED:** Marketable title shall be conveyed by a _____ Warranty _____ deed, and shall be free and
   clear of all encumbrances except usual public utilities serving the PROPERTY.

5. **TRANSFER OF TITLE:** On or before _____ November 7th, 2007 _____ at _____ Carroll County Registry of Deeds _____ or
   some other place of mutual consent as agreed to in writing.

6. **POSSESSION:** Full possession and occupancy of the premises with all keys shall be given upon the transfer of title free of
   all tenants and occupant's personal property and encumbrances except as herein stated. Said premises to be then in the
   same condition in which they now are, reasonable wear and tear excepted. SELLER agrees that the premises will be
   delivered to BUYER free of all debris and in "broom clean" condition. Exceptions: _____

   Buyer reserves the right to conduct a walk through inspection upon reasonable notice to SELLER's AGENCY within ___ 48 ___
   hours prior to time of closing to ensure compliance with the terms of this Agreement.

7. **AGENCY:** The undersigned SELLER(S) and BUYER(S) acknowledge the roles of the agents as follows:
   _____ Steve Anderson _____ of _____ Pinkham Real Estate _____ is a ☐ seller agent ☒ buyer agent ☐ non-agent ☐ disclosed dual agent*
   _____ Joy Tarbell _____ of _____ Prudential Joy Tarbell Realty _____ is a ☒ seller agent ☐ buyer agent ☐ non-agent ☐ disclosed dual agent*
   *If agent(s) are acting as disclosed dual agents, SELLER and BUYER acknowledge prior receipt and signing of a Dual
   Agency Informed Consent Agreement.

8. **INSURANCE:** The buildings on said premises shall, until full performance of this Agreement, be kept insured against fire, with
   extended coverage by SELLER. In case of loss, all sums recoverable from said insurance shall be paid or assigned, on delivery
   of deed, to BUYER, unless the premises shall previously have been restored to their former condition by SELLER; or, at the
   option of BUYER, this Agreement may be rescinded and the DEPOSIT refunded if any such loss exceeds $ ___ 1,000.00 ___.

9. **TITLE:** If upon examination of title it is found that the title is not marketable, SELLER shall have a reasonable time, not to
   exceed thirty (30) days from the date of notification of defect (unless otherwise agreed to in writing), to remedy such defect.
   Should SELLER be unable to provide marketable title within said thirty (30) days, BUYER may rescind this Agreement at
   BUYER'S sole option, with full deposit being refunded to BUYER and all parties being released from any further obligations
   hereunder. SELLER hereby agrees to make a good faith effort to correct the title defect within the thirty (30) day period
   above prescribed once notification of such defect is received. The cost of examination of the title shall be borne by BUYER.

**SELLER(S) INITIALS** _PW_ / _JCH_ .      **BUYER(S) INITIALS** _PW_ /

© 2007 NEW HAMPSHIRE ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED 05/2007

Form generated by: **TrueForms™** from **REVEAL® SYSTEMS, Inc.** 800-499-9612

### PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
### New Hampshire Association of REALTORS® Standard Form



10. **TAXES,** condo fees, special assessments, rents, water and sewage bills and fuel in storage shall be prorated as of time and date of closing or _____.

11. **PROPERTY INCLUDED:** All Fixtures __Inventory of furnishings, fixtures, and all equipment to be agreed upon by buyer_____ _____and seller with in 7 days of signed agreement._____

_____

12. In compliance with the requirements of RSA 477:4-a, the following information is provided to BUYER relative to Radon Gas and Lead Paint:

 **RADON GAS:** Radon gas, the product of decay of radioactive materials in rock may be found in some areas of New Hampshire. This gas may pass into a structure through the ground or through water from a deep well. Testing can establish its presence and equipment is available to remove it from the air or water.

 **LEAD PAINT:** Before 1978, paint containing lead may have been used in structures. The presence of flaking lead paint can present a serious health hazard, especially to young children and pregnant women. Tests are available to determine whether lead is present.
 Disclosure Required  ☐YES  ☒NO

> **BUYER ACKNOWLEDGES PRIOR RECEIPT OF SELLER PROPERTY DISCLOSURE FORM ATTACHED HERETO AND SIGNIFIES BY INITIALING HERE:** _____    _____

13. **DUE DILIGENCE:** The BUYER is encouraged to seek information from professionals normally engaged in the business regarding any specific issue of concern. SELLER'S AGENCY makes no warranties or representations regarding the condition, permitted use or value of the SELLER'S real or personal property. This Agreement is contingent upon the following inspections, with results being satisfactory to the BUYER:

| TYPE OF INSPECTION: | YES | NO | RESULTS TO SELLER | TYPE OF INSPECTION: | YES | NO | RESULTS TO SELLER |
|---|---|---|---|---|---|---|---|
| a. General Building | ☒ | ☐ | within __14__ days | f. Lead Paint | ☐ | ☒ | within _____ days |
| b. Sewage Disposal | ☒ | ☐ | within __14__ days | g. Pests | ☐ | ☒ | within _____ days |
| c. Water Quality | ☒ | ☐ | within __14__ days | h. Hazardous Waste | ☒ | ☐ | within __14__ days |
| d. Radon Air Quality | ☒ | ☐ | within __14__ days | i. _____ | ☐ | ☐ | within _____ days |
| e. Radon Water Quality | ☒ | ☐ | within __14__ days | j. _____ | ☐ | ☐ | within _____ days |

**The use of days is intended to mean calendar days from the effective date of this Agreement.** All inspections will be done by professionals normally engaged in the business, to be chosen and paid for by BUYER. If BUYER does not notify SELLER that the results of an inspection are unsatisfactory within the time period set forth above, the contingency is waived by BUYER. TIME IS OF THE ESSENCE. If the results of any inspection specified herein reveal significant issues or defects, which were not previously disclosed to BUYER, then:

 (a) SELLER shall have the option of repairing or remedying the unsatisfactory condition(s) prior to transfer of title, so long as BUYER and SELLER both agree on the method of repair or remedy; or

 (b) if SELLER is unwilling or unable to repair or remedy the unsatisfactory condition(s) or BUYER and SELLER cannot reach agreement with respect to the method of repair or remedy, then this Agreement shall be null and void, and all deposits will be returned to BUYER in accordance with the procedures required by the New Hampshire Real Estate Practice Act (N.H. RSA 331-A:13); or

 (c) BUYER may terminate this Agreement in writing and all deposits will be returned to BUYER in accordance with the procedures required by the New Hampshire Real Estate Practice Act (N.H. RSA 331-A:13).

**SELLER(S) INITIALS** _PW_ / _____    **BUYER(S) INITIALS** _____ / _____

© 2007 NEW HAMPSHIRE ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED  05/2007

Form generated by: **TrueForms™** from **REVEAL⊘** SYSTEMS, Inc. 800-499-9612

**PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT**
**New Hampshire Association of REALTORS® Standard Form**



Notification in writing of SELLER'S intent to repair or remedy should be delivered to BUYER or BUYER'S Agent within five (5) days of receipt by SELLER of notification of unsatisfactory condition(s). In the absence of inspection mentioned above, BUYER is relying upon BUYER'S own opinion as to the condition of the PROPERTY.

BUYER HEREBY ELECTS TO *WAIVE THE RIGHT* TO ALL INSPECTIONS AND SIGNIFIES BY INITIALING HERE: _____    _____

This Agreement is contingent upon BUYER'S review of the following:

|  | YES | NO |  | YES | NO |
|---|---|---|---|---|---|
| a. Restrictive Covenants of Record | ☒ | ☐ | d. Condominium documentation per N.H. RSA 356-B:58 | ☐ | ☐ |
| b. Easements of Record/Deed | ☐ | ☐ | e. Co-op/PUD/Association Documents | ☐ | ☐ |
| c. Park Rules and Regulations | ☐ | ☐ | f. Availability of Property/Casualty Insurance | ☒ | ☐ |

If such review is unsatisfactory, BUYER must notify SELLER in writing within __14__ days from the effective date of the Agreement failing which such contingency shall lapse.

14. **LIQUIDATED DAMAGES**: If BUYER shall default in the performance of their obligation under this Agreement, the amount of the deposit may, at the option of SELLER, become the property of SELLER as reasonable liquidated damages. In the event of any dispute relative to the deposit monies held in escrow, the **ESCROW AGENT** may, in its sole discretion, pay said deposit monies into the Clerk of Court of proper jurisdiction in an Action of Interpleader, providing each party with notice thereof at the address recited herein, and thereupon the **ESCROW AGENT** shall be discharged from its obligations as recited therein and each party to this Agreement shall thereafter hold the **ESCROW AGENT** harmless in such capacity. Both parties hereto agree that the **ESCROW AGENT** may deduct the cost of bringing such Interpleader action from the deposit monies held in escrow prior to the forwarding of same to the Clerk of such court.

15. **PRIOR STATEMENTS**: Any verbal representation, statements and agreements are not valid unless contained herein. This Agreement completely expresses the obligations of the parties.

16. **FINANCING**: This Agreement ( ☒ is) ( ☐ is not) contingent upon BUYER obtaining financing under the following terms:

AMOUNT ___815,000.00 *___    TERM/YEARS ___*___    RATE ___*___    MORTGAGE TYPE ___*___

_____ * Owner to finance $100,000.00 for a period of 5 years at 7% interest _____

For the purposes of this Agreement, financing is to be demonstrated by a conditional loan commitment letter, which states that BUYER is creditworthy, has been approved and that the lender shall make the loan in a timely manner at the Closing on specified customary conditions for a loan of the type specified above. BUYER is responsible to resolve all conditions included in the loan commitment by the Closing date.

The existence of conditions in the loan commitment will not extend either the Financing Deadline described below or the closing date.

BUYER hereby authorizes, directs and instructs its lender to communicate the status of BUYER'S financing and the satisfaction of lender's specified conditions to SELLER and SELLER'S/BUYER'S AGENCY.

TIME IS OF THE ESSENCE in the observance of all deadlines set forth within this financing contingency.

SELLER(S) INITIALS _____ / _____    BUYER(S) INITIALS _____ / _____

© 2007 NEW HAMPSHIRE ASSOCIATION OF REALTORS® , INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED   05/2007

Form generated by: **TrueForms**™ from **REVEAL** Ⓡ SYSTEMS, Inc. 800-499-9612

## PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
### New Hampshire Association of REALTORS® Standard Form



BUYER agrees to act diligently and in good faith in obtaining such financing and shall, within ___ ___ 7 ___ calendar days from the effective date, submit a complete and accurate application for mortgage financing to at least one financial institution currently providing such loans, requesting financing in the amount and on the terms provided in this Agreement.

If BUYER provides written evidence of inability to obtain financing to SELLER by ___ ___ 21 ___ ___ ("Financing Deadline"), then:

    (a) This Agreement shall be null and void; and

    (b) All deposits will be returned to BUYER in accordance with the procedures required by the New Hampshire Real Estate Practice Act (N.H. RSA 331-A:13) ("the Deposit Procedures"); and

    (c) The premises may be returned to the market.

BUYER may choose to waive this financing contingency by notifying SELLER in writing by the Financing Deadline and this Agreement shall no longer be subject to financing.

If, however:

    (a) BUYER does not make application within the number of days specified above; or

    (b) BUYER fails to provide written financing commitment or written evidence of inability to obtain financing to SELLER by the Financing Deadline,

Then SELLER shall have the option of either:

    (a) Declaring BUYER in default of this Agreement; or

    (b) Treating the financing contingency as having been waived by BUYER.

If SELLER declares BUYER in default, in addition to the other remedies afforded under this Agreement:

    (a) SELLER will be entitled to all deposits in accordance with the Deposit Procedures; and

    (b) This Agreement will be terminated; and

    (c) The premises may be returned to the market for sale.

If SELLER opts to treat the financing contingency as waived or relies on a conditional loan commitment and BUYER subsequently does not close in a timely manner, SELLER can then declare BUYER in default. SELLER then, in addition to the other remedies afforded under this Agreement:

    (a) Will be entitled to all deposits in accordance with the Deposit Procedures; and

    (b) This Agreement will be terminated; and

    (c) The premises may be returned to the market for sale.

BUYER shall be solely responsible to provide SELLER in a timely manner with written evidence of financing or lack of financing as described above.

SELLER(S) INITIALS _____ / _____          BUYER(S) INITIALS _____ / _____

© 2007 NEW HAMPSHIRE ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED  05/2007

Form generated by: TrueForms™ from REVEAL© SYSTEMS, Inc. 800-499-9612

*Tom & Karen Hawley* (handwritten signatures at top)

## PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
### New Hampshire Association of REALTORS® Standard Form



**17. ADDITIONAL PROVISIONS:** *8%*

1. Seller agrees to provide a second mortgage in the amount of $100,000.00 at 7% for 5 years. *8% — PW KH*
2. Seller agrees to have such mortgage and warranty deed drawn up and available at the closing table.
3. This agreement is contingent upon bank appraisal at a price equal to or exceeding the purchase price.
4. The buyer wishes to purchase the property for $1,025,000.00 with closing on or before November 7, 2007. The buyer will be doing a site review and appraisal for financing.
5. Buyer shall have 14 days from signed agreement to review and accept all financial information to include, but not be limited to a profit and loss statement and one years worth of utility bills regarding the business and the property *Utilities all set*
6. The seller agrees to stay on for an additional 2 weeks to help transition the operations for training purposes at no additional cost to the buyer. *New owners will provide room for the 2 weeks*
7. Seller understands buyer is purchasing the Wild Boar name and menu. *If news owners change name Hawley have right to name*
8. Seller agrees to pay all closing costs. *SEE NOTE*
9. This agreement is contingent upon buyer conducting and approving a complete inventory of all furnishings, fixtures, and equipment with in 7 days of signed agreement. All furnishings from the Inn will transfer to the buyer *Buyers will write what is to taken*
10. This agreement is also contingent upon an approved Phase 1 environmental survey

*(handwritten) Both Parties agreed that it will be up to Keckin*

*(handwritten) 8) Sellers Pay closing costs Except Buyers Pay own Lawyers fee and Buyers & Seller split Transfer tax 50/50 Buyers will Pay own Points and own loan Related fees 10/13/07*

(left margin handwritten notations: TCH PW / TCH / TCH / TCH / TCH / 2006 / KH TCH PW / KH TCH PW / PW TCH KH / KH PW / KH TCH PW / TCH PW)

**18. EFFECTIVE DATE:** This is a binding contract and the effective date is when signed and dated, whether by electronic transfer or original, and all changes initialed and dated, by SELLER and BUYER.

Each party is to receive a fully executed duplicate original of this Agreement. This Agreement shall be binding upon the heirs, executors, administrators and assigns of both parties.

**PRIOR TO EXECUTION, IF NOT FULLY UNDERSTOOD, PARTIES ARE ADVISED TO CONTACT AN ATTORNEY.**

| | | |
|---|---|---|
| BUYER  Paula Wallem | DATE  10/12/07  TIME | BUYER  DATE  TIME |
| ADDRESS  147 Ridge Road | | ADDRESS |
| CITY / STATE / ZIP  Portland , ME | | CITY / STATE / ZIP |

SELLER accepts the offer and agrees to deliver the above-described PROPERTY at the price and upon the terms and conditions set forth.

| | | |
|---|---|---|
| SELLER  Thomas Hanley | DATE  10/12/07  TIME | SELLER  Karen Hanley  DATE  10/12/07  TIME |
| ADDRESS  3645 White Mountain Highway | | ADDRESS  3645 White Mountain Highway |
| CITY / STATE / ZIP  North Conway, NH 03860 | | CITY / STATE / ZIP  North Conway, NH 03860 |

© 2007 NEW HAMPSHIRE ASSOCIATION OF REALTORS® , INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED  05/2007

Form generated by TrueForms™ from REVEAL® SYSTEMS, Inc. 800-499-9612

# ADDENDUM

### TO THE PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
#### New Hampshire Association of REALTORS® Standard Form



Addendum to the Purchase and Sales Agreement and Deposit Receipt dated _____ October 12, 2007 _____ between

_____ Thomas and Karen Hanley _____ ("SELLER"), and

_____ Paula Wallem _____ ("BUYER"), for

the property located at _____ 3485 White Mountain Hwy, North Conway, NH 03860 _____

hereby agree to the following:

The date for the receipt of the $10,000.00 deposit is hereby extended to October 19, 2007.

All other aspects of the aforementioned Purchase and Sales Agreement and Deposit Receipt shall remain in full force and effect.

EACH PARTY IS TO RECEIVE A FULLY EXECUTED DUPLICATE ORIGINAL OF THIS AGREEMENT.

| BUYER | Paula Wallem | 10/15/07 / DATE / TIME | BUYER | 10/18/07 #5:16 PM DATE / TIME |
|---|---|---|---|---|
| SELLER | | 10 18 07 DATE / TIME | SELLER | 10 18 07, 05:15 PM DATE / TIME |

© 2005 NEW HAMPSHIRE ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED. 01/2005

Form generated by: TrueForms™ from REVEAL ® SYSTEMS, Inc. 800-499-9612

# ADDENDUM
## TO THE PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
### New Hampshire Association of REALTORS® Standard Form



Addendum to the Purchase and Sales Agreement and Deposit Receipt dated _____ September 12, 2007 _____ between

_____ Tom and Karen Hanley _____

_____ *walton* _____ ("SELLER"), and

Paula W̶a̶l̶t̶o̶m̶ and ~~Barry Sandy~~ and or as̶s̶i̶g̶n̶s̶ *assigns* _____

_____ ("BUYER"), for

the property located at _____ 3645 White Mountain Highway North Conway, NH. 03860 _____

hereby agree to the following:

The time for performance of approval of financial's and the financing contingency are hereby extended until November 14, 2007.

The time for performance of approval of the level 1 environmental survey and the appraisal is hereby extended until December 7, 2007

The date of transfer of title is hereby extended until on or before ~~January 15, 2008~~  *December 15, 2007*

*(KN)  (TCH)*

All other aspects of the aforementioned Purchase and Sales Agreement and Deposit Receipt shall remain in full force and effect.

**EACH PARTY IS TO RECEIVE A FULLY EXECUTED DUPLICATE ORIGINAL OF THIS AGREEMENT.**

BUYER *Paula Walton*     DATE / TIME *11/6/07*     BUYER _____ *TCH*     DATE / TIME

SELLER *Karen Hanley*     DATE / TIME *11/8/07*     SELLER _____     DATE / TIME *11/8/07*

© 2005 NEW HAMPSHIRE ASSOCIATION OF REALTORS® , INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED 01/2005

Form generated by: TrueForms™ from REVEAL® SYSTEMS, Inc. 800-499-9612

# ADDENDUM
## TO THE PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
### New Hampshire Association of REALTORS® Standard Form



KH    TCH
     PW

Addendum to the Purchase and Sales Agreement and Deposit Receipt dated ___October___ September 12, 2007 ___ between

_____ Tom and Karen Hanley _____

_____ Wallen _____ ("SELLER"), and

Paula Wallen and ~~Bruce Smith~~ and or assigns ___assigns___

_____ ("BUYER"), for

the property located at _____ 3645 White Mountain Highway North Conway, NH. 03860 _____

hereby agree to the following:

The time for performance of approval of financial's and the financing contingency are hereby extended until ~~November 14, 2007.~~ DECEMBER    TCH KH PW

The time for performance of approval of the level 1 environmental survey and the appraisal is hereby extended until December 7, 2007

The date of transfer of title is hereby extended until on or before ~~January 15, 2008~~    ~~December 31, 2007~~

DECEMBER 31 (KH) (TCH) PW
2007

HOWEVER BECAUSE OF THE HOLIDAYS WE WILL AGREES
TO A 2 WEEK EXTENSION FOR A TRANSFER OF TITLE
UNTIL JANUARY 14 2008    TCH    KH (PW)

**All other aspects of the aforementioned Purchase and Sales Agreement and Deposit Receipt shall remain in full force and effect.**

**EACH PARTY IS TO RECEIVE A FULLY EXECUTED DUPLICATE ORIGINAL OF THIS AGREEMENT.**

BUYER _Paula Wallen_    DATE / TIME _11/6/07_    BUYER _____ TCH    DATE / TIME _____

SELLER _Karen Ha_    DATE / TIME _11/8/07_    SELLER _____    DATE / TIME _11/8/07_

© 2005 NEW HAMPSHIRE ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED  01/2005

Form generated by: TrueForms™ from REVEAL® SYSTEMS, Inc. 800-499-9612

**Prudential**
Joy Tarbell Realty



# ADDENDUM
## TO THE PURCHASE AND SALES AGREEMENT AND DEPOSIT RECEIPT
### New Hampshire Association of REALTORS® Standard Form

Addendum to the Purchase and Sales Agreement and Deposit Receipt dated _____ October 12, 2007 _____ between

_____ Tom and Karen Hanley _____

("**SELLER**"), and

_____ Paula Wallem or assigns _____

("**BUYER**"), for

the property located at _____ the Wild Boar Tavern, 3465 White Mountain Hwy, North Conway NH _____

hereby agree to the following:

Buyer agrees that the Hanleys may use $5,000 of the $10,000 escrow deposit, leaving a balance of $5,000 in the escrow account.

All other aspects of the aforementioned Purchase and Sales Agreement and Deposit Receipt shall remain in full force and effect.

EACH PARTY IS TO RECEIVE A FULLY EXECUTED DUPLICATE ORIGINAL OF THIS AGREEMENT.

BUYER    Paula Wallem    DATE 11/25/07 / TIME    BUYER    DATE / TIME

SELLER   Thomas Hanley   DATE 11/05/07 / TIME   SELLER   Karen Hanley   DATE 11/25/07 / TIME

© 2005 NEW HAMPSHIRE ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED FOR USE BY NHAR REALTOR® MEMBERS ONLY. ALL OTHER USE PROHIBITED  01/2005

Form generated by: **TrueForms**™ from REVEAL SYSTEMS, Inc. 800-499-9612