**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRIE D. SANDY, an individual, ) | Case No. 08-3052 SC |
| ) | |
| Plaintiff, ) | MEMORANDUM OF DECISION, |
| ) | FINDINGS OF FACT, AND |
| v. ) | CONCLUSIONS OF LAW |
| ) | |
| MARK McCLURE, an individual; PAULA ) | |
| R. WALLEM, an individual; MB ) | |
| EQUITY PARTNERS, LCC, a Delaware ) | |
| limited liability company; DOES 1 ) | |
| through 20, ) | |
| ) | |
| Defendants. ) | |
| ) | |

I.  **INTRODUCTION**

This suit arises out of a series of failed business ventures involving Plaintiff Barrie Sandy ("Sandy" or "Plaintiff") and Defendants Mark McClure ("McClure") and Paula Wallem ("Wallem") (collectively, "Defendants").[1]  See Compl., Docket No. 1.  These transactions include the purchase and management of several condominiums in Maine, a failed venture to purchase a chain of boutique hotels, and an unsuccessful lease-to-purchase arrangement involving a tavern in New Hampshire.  Id.  Sandy is asserting a total of thirteen causes of action against Defendants, including 1)

---

[1] Although MB Equity Partners, LLC, is also named as a defendant in this suit, it did not appear and default was entered against it. Docket No. 17.  Sandy's trial brief only identifies McClure and Wallem as "Defendants."  See Pl.'s Br. at 1.

Breach of Contract, 2) Money Had and Received, 3) Account Stated, 4) Breach of Covenant of Good Faith and Fair Dealing, 5) Negligence, 6) five theories of Fraud, 7) Breach of Fiduciary Duty, 8) Intentional Infliction of Emotional Distress ("IIED"), and 9) Unjust Enrichment.  Defendants are both proceeding pro se.

The Court previously denied Defendants' request to transfer this action to Maine, and denied Defendants' Motion to Dismiss. Docket Nos. 32, 42.  The Court held a two-day bench trial from December 7, 2009, to December 8, 2009.[2]  Both parties submitted trial briefs.  Docket Nos. 106 (Pl.'s Br.), 117 (Defs.' Br.).

The Court by this memorandum of decision issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court concludes that Sandy incurred damages as a result of McClure's breach of contract, and is therefore entitled to recover a total of $166,533.06 from McClure.

## II.  **FINDINGS OF FACT**

### A.   **The Parties**

1.  Barrie Sandy is an individual who currently resides in Napa, California.  TP[3] at 4:25-5:1 (test. of Sandy); Pl.'s Proposed Findings of Fact & Conclusions of Law ("PFFCL"), Docket

---

[2] Defendants did not move to admit their exhibits into evidence until after trial, at which point they submitted a letter requesting admission of most of the documents that they relied upon at trial.  Docket No. 125.  The Court hereby ADMITS the following documents into evidence: Defs.' Exs. 502, 503, 508, 514, 518, 519, 521, 528, 530, 539, 540, 541, 542, 544, 545, 546, 548, 549, 550, 570, 571. The Court declines to admit Defendants' Exhibits 501, 507, 531 and 536, however it notes that consideration of these documents would not alter the outcome of this decision.
[3] "TP" refers to the Transcript of Proceedings for the trial held from December 7, 2009, to December 8, 2009.

No. 105, ¶ 2.  Sandy is currently a reverse mortgage lender with Bank of America.  TP at 3:4-7 (test. of Sandy).  He has previously been employed as a territory sales manager for Baylar Equipment in Arizona, as a district sales manager for Advo, Inc., and as vice president of industry relations for American Floral Services.  Id. at 3:9-12, 21-25, 4:1-4.  Sandy has had previous experience investing in startup companies.  Id. at 3:13-17.

2.  Paula Wallem and Mark McClure are individuals who are married to one another, and who currently reside in Dallas, Texas.  See TP at 7:17-20 (test. of Sandy); 337:23-24 (test. of McClure).  They operate a business called Mark McClure International ("MMI"), which markets commercial strategies for individuals and businesses.  Id. at 5:24-6:4 (test. of Sandy).

3.  Sandy began working with Defendants in mid 2006, when he entered a licensing agreement to distribute and receive commissions for commercials or infomercials that feature McClure's investment and marketing strategies.  PFFCL ¶ 14; TP at 279:13-280:1 (test. of McClure).  This licensing arrangement ultimately did not turn into a profitable venture.[4]

4.  MB Equity Partners, LLC ("MB Equity"), was organized in the State of Delaware on January 3, 2007.  PFFCL ¶ 18; Pl.'s Exs. 5-6.  McClure and Sandy each held a 50% ownership interest in MB Equity.  TP at 15:20-16:7 (test. of Sandy).  At some point after February of 2007, McClure transferred his 50% interest in MB Equity

---

[4] The parties spent a considerable amount of time discussing why this venture did not ultimately bear fruit.  Although Sandy mentions that he was not compensated for his losses in his Complaint, Compl. ¶ 68, he has apparently abandoned this claim as of trial, as he does not discuss it in his trial brief and has not attempted at trial to demonstrate any losses from this transaction.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

to Wallem.  Id. at 226:3-14 (test. of Wallem).[5]  At some point after January of 2008, MB Equity ceased doing business.  Id. at 24:8-24:14 (test. of Sandy).  While it was in operation, MB Equity was apparently operating out of, and collecting its mail in, the State of Maine.  See id. at 97:18-24 (test. of Sandy); 287:2-8 (test. of McClure).

**B.   Acquisition of the Ocean Ridge Condominiums**

5.  Around the end of 2006, McClure and Sandy began discussing other possible business ventures.  McClure became aware of a "very attractive" deal involving condominiums located in Portland, Maine, which could be acquired for less than appraisal value.  TP at 188:21-25 (test. of Wallem); 280:9-14 (test. of McClure).  Part of the purchase deal for the condos included the receipt of an immediate payout from the lenders upon closing.  PFFCL at 4 n.2; TP at 189:1-6 (test. of Wallem).  McClure and Wallem purchased two such condos, and attempted to persuade their friends and associates to do likewise.  Id. at 188:21-25.  They suggested that Sandy purchase several of these condos.  PFFCL ¶ 17; TP at 9:17-24 (test. of Sandy).

6.  As part of their ongoing interest in forming a business enterprise together, McClure and Sandy decided to form a limited liability company to manage and own commercial real properties as investments.  PFFCL ¶ 18.  On January 3, 2007, MB Equity was organized in the State of Delaware.  Id.; Pl.'s Exs. 5-6.  McClure and Sandy each held a 50% ownership interest in MB

---

[5] Defendants did not provide a credible explanation for why this transfer took place.  Nevertheless, none of Sandy's causes of action depend upon the reason for this transfer, and the Court makes no findings regarding Defendants' motivations for making this transfer.

**United States District Court**
For the Northern District of California

Equity.  TP at 15:20-16:7 (test. of Sandy).

7.  To persuade Sandy to finance the acquisition of two of the condos, McClure and Wallem agreed to manage the Ocean Ridge Condos on behalf of MB Equity.  TP at 189:1-6 (test. of Wallem). They also agreed to assume 80% of the "debt service" related to the condos.  Pl.'s Ex. 27 ("Nov. 26, 2006, Email") at 1.  McClure stated that "[w]e will be 50/50 but on deals where you get the financing, I will be responsible for 80% of the debt services should we have to put in."  Id. at 1.  The goal of the transaction was to sell the condos at a profit within several months.  TP at 359:23-360:5 (test. of McClure).  In addition, Defendants would receive part of the money released at closing as a finders' fee, as well as fees for managing the condos.  Id. at 189:1-6 (test. of Wallem).

8.  Sandy purchased two of the condos, one on January 6, 2007, and another on January 19, 2007 (the "Ocean Ridge Condos"). PFFCL ¶ 19; TP at 13:9-24 (test. of Sandy).  He borrowed a total of $677,000 to purchase these condos.  TP at 25:15-17 (test. of Sandy).  The parties did not execute an agreement regarding their responsibilities with regard to the Ocean Ridge Condos at this time.

9.  In mid-February, Sandy and McClure entered into a separate agreement in contemplation of another venture, for which they created a loan contract.  See Part II.C, infra; Pl.'s Ex. 12 ("February Contract") at 1.  Although this contract focused on a separate transaction between the parties, it also memorialized their arrangement with respect to the Ocean Ridge Condos.  It stated that "Mark McClure also agrees to honor previous agreements

**United States District Court**
For the Northern District of California

made with licensee and business partner Barrie Sandy. . . .
Fulfillment of leasing and/or sale of two condos in Portland, Maine
purchased in partnership and agreement to assume 80% of unpaid
monthly/annual debt." February Contract at 1. McClure executed
the contract on February 12, 2007; Sandy never executed the
contract. See id.

    10. Defendants both contend that Sandy promised to
transfer a 50% interest in the Ocean Ridge Condos to them, or to
transfer ownership of the condos to MB Equity. TP at 189:1-6
(test. of Wallem), 316:18-20 (test. of McClure). However, in spite
of providing voluminous correspondences for the relevant period at
trial, Defendants were unable to identify a single request to
transfer title for the condos. Nothing in writing suggests such an
agreement. Id. at 304:14-19 (test. of McClure). The Court also
notes that McClure himself was acting on Sandy's behalf when Sandy
purchased the condos; Sandy granted McClure power of attorney, and
McClure executed the agreements on Sandy's behalf. Id. at 316:15-
20; Defs.' Br. at 3. This suggests that McClure assented to the
structure of the purchase, and to Sandy's possession of the title
to the condos. The Court finds that the parties did not enter into
an agreement to hold the Ocean Ridge Condos jointly, although they
did agree to split any proceeds from the sale or rental of those
units (hence the statement in the February Contract that the condos
were purchased "in partnership").

    11. For about ten months after the purchase of the Ocean
Ridge Condos, McClure and Wallem managed the condos, paid the
mortgages, found renters, and otherwise met the requirements of
their agreement with Sandy. PFFCL ¶ 20; TP at 6:14-17 (test. of

Sandy).

12. In November of 2007, Defendants ceased paying the mortgage and fees on one of the Ocean Ridge Condos, and ceased payments on the other unit in February of 2008.  TP at 26:2-6 (test. of Sandy).  Sandy claims that the he did not learn that Defendants ceased paying for the first condo until January of 2008. Id. at 95:3-6.  Wallem claims that she informed Sandy that MB Equity's funds had been nearly exhausted by this point, and that there was not enough left to pay for the condos.  Id. at 267:21-268:2, 268:22-269:10 (test. of Wallem).  Regardless of when Sandy learned that money was due in relation to the condos, he took over the payments himself.  Id. at 97:15-98:12 (test. of Sandy).  He paid a total of $52,341.76 in mortgage payments, condo fees, taxes and utilities.  Id. at 25:7-11; PFFCL ¶ 95.

13. Sandy has sold one of the Ocean Ridge Condos for $207,000 and a sale of the other condo for $205,000 is currently pending.  TP at 25:12-14 (test. of Sandy).  Sandy has apparently used and will use the proceeds from these sales to repay the loans that he undertook to purchase these condos.  Although this will leave $265,000 of Sandy's loan unpaid ($677,000 borrowed for the purchase minus $412,000 received upon sale), the lender has forgiven this shortfall.  Id. at 99:13-101:13.

### C.   **Efforts to Acquire Hotels**

14. While the parties were handling the Ocean Ridge condo transactions, they were also discussing the possibility of acquiring a chain of upscale boutique hotels.  Id. at 18:8-12. They initially planned to fund this venture by trading shares of a public shell (related to MB Equity) on the Over the Counter

7

**United States District Court**
For the Northern District of California

1    Bulletin Board ("OTCBB").  Id. at 18:13-19:6; Pl.'s Ex. 30 ("Jan.

2    30 Email Chain") at 2, 4.

3          15. McClure also requested that Sandy provide MB Equity a

4    $100,000 bridge loan to handle the costs involved in finding

5    investors and investigating possible hotel purchases.  Jan 30 Email

6    Chain at 4.  McClure told Sandy that "[t]he $100K you put up will

7    be paid back IN FULL in 12 months with 1 year's interest reserve

8    set aside upfront . . . ."  Id.

9          16. On February 1, 2007, Sandy emailed McClure in an

10   email titled "HELOC Interest," apparently discussing the interest

11   rate of a loan that Sandy would receive to finance his loan to MB

12   Equity.  Sandy stated that they were "[l]ooking at a rate around

13   8%."  Pl.'s Ex. 28 ("Feb. 1 Email Chain") at 1.  McClure responded

14   by stating, "[t]hat's great," although he was hoping for something

15   around 6%.  Id.

16         17. On February 12, 2007, McClure executed the February

17   Contract.  This document, which "serves as a contract between

18   Barrie Sandy and Mark McClure," required Sandy to provide a loan of

19   $100,000 to MB Equity.  "The use of these funds is strictly

20   intended for the purpose of launching a business venture known as

21   MB Hotels, a development of a chain of upscale boutique hotels."

22   February Contract at 1.  The February Contract required full

23   reimbursement of the loan "[a]s soon as additional funds are

24   raised."  Id.  It stated that "[a]ll interest payments will be kept

25   current . . . ."  Id.  McClure also agreed to be personally liable

26   for the loan, in the event that MB Equity could not raise enough

27   funds to repay Sandy on its own:

28         If for any reason necessary funding is not raised

to replace loan from Barrie Sandy and all related interest charges, Mark McClure agrees to accept full responsibility for pay-off of loan and all interest charges.  If funding from MB Hotels is no longer available for payment of monthly interest payment, responsibility of payment will immediately defer to Mark McClure who will keep all monthly interest payments current and on time.  If responsibility of payment should defer to Mark McClure and if any payment is delinquent, then a penalty of 10% of delinquent loan amount will be assessed to the unpaid amount.

Id.

18. Although Sandy did not execute the February Contract, he loaned $100,000 to MB Equity on or around the date that McClure executed that contract.  TP at 20:2-19 (test. of Sandy).  At that time, MB Equity was apparently operating out of a Bank of America account located in Portland, Maine.  Id. at 87:22-88:2.

19. On February 14, 2007, McClure informed Sandy that he had received advice that persuaded him that MB Equity should procure a hotel property before it proceeded with the OTCBB sale. Pl.'s Ex. 31 ("Feb. 14 Email") at 1.  The OTCBB sale never went forward.

20. On February 27, 2007, McClure sent Sandy an email, stating that he would issue an "interest check" for $8,007.  Pl.'s Ex. 29 ("Feb. 27 Email") at 1.

21. The Court finds that McClure and Sandy had agreed to an 8% rate of interest for the $100,000 loan in the February Contract, and that McClure paid the first year of this interest.[6]

---

[6] McClure claims that he never promised to pay any interest to Sandy on the $100,000 loan to MB Equity.  TP at 99:4-13 (test. of McClure).  The Court finds that this testimony lacks credibility. In the February Contract, McClure expressly agreed to repay interest to Sandy.  In addition, Sandy has submitted evidence that he actually received interest of 7.49% -- and not 8% -- when he borrowed $100,000 for the purpose of lending it to MB Equity. Pl.'s Ex. 25.  Yet McClure wrote the "interest check" for $8007

**United States District Court**
For the Northern District of California

1    The Court also finds that they had agreed for the loan to be paid

2    back within one year.  <u>See</u> Jan 30 Email Chain at 4.

3        22. MB Equity unsuccessfully sought to purchase several

4    hotel properties, and ultimately made an offer to purchase Eastland

5    Park Hotel, located in Portland, Maine.  TP at 36:7-13 (test. of

6    Sandy).[7]

7        **D.   McClure's Bankruptcy**

8        23. In October of 2007, an involuntary bankruptcy

9    petition was filed against McClure.  TP at 287:17-20 (test. of

10   McClure).  It was vacated on December 7, 2007.  <u>Id.</u> at 288:2-4;

11   Pl.'s Ex. 80.

12       24. Sandy contends that he did not discover the

13   bankruptcy proceeding until February of 2008.  <u>Id.</u> at 49:16-19

14   (test. of Sandy).  In spite of McClure's contention that he "[t]old

15   everybody" about the proceeding, <u>id.</u> at 288:2-14 (test. of

16   McClure), he has not identified any specific communication to Sandy

17   that communicates the bankruptcy.  The Court finds Sandy's

18   testimony to be more credible, and concludes that Sandy was not

19   informed of McClure's bankruptcy proceeding until February of 2008.

20

21   _____

shortly after he executed the February Contract.  <u>See</u> Feb. 27 Email
at 1.  The Court believes that this check prepaid <u>the</u> interest that
MB Equity owed to Sandy.
[7] Once again, the parties have spent large amounts of time
discussing the Eastland Park Hotel transaction, as well as other
attempts to investigate and purchase other properties.  <u>See</u> PFFCL
¶ 25-29.  Their discussion includes a controversy over a <u>note</u> for
$35,000, on which McClure allegedly forged Sandy's signature, and
McClure's unsupported and incredible allegations regarding an
incident in which Sandy collapsed after a meeting in Miami.  The
Court simply notes that Sandy does not even attempt to prove a
claim that rests upon any of these events, with the possible
exception of his fraud and IIED claims, discussed <u>infra</u>.  There is
no need for this Court to issue particular findings as to these
details.

**United States District Court**
For the Northern District of California

**E.   The Wild Boar Tavern**

25. On October 6, 2007, McClure sent Sandy an email
stating that he had discovered an opportunity to acquire a tavern
called The Wild Boar (the "Tavern"), which was located in North
Conway, New Hampshire.  Pl.'s Ex. 38 ("Oct. 6 Email") at 1.

26. McClure told Sandy that the Tavern could be acquired
for $1.065 million, which McClure characterized as a "bargain."
Id.  McClure wished for MB Equity to both own and operate the
Tavern, and claimed to have "structured a deal of $7500 per month .
. . . .  50% of that $7,500 per month will be applied to the purchase
price at the end of year as a credit, if we do not pull the trigger
it will be applied later on, but only a 50% credit from the first
year."  Id.

27. McClure proposed "a 50-50 partnership."  Id.  He
stated that he would ask Sandy only for $60,000, "with Paula and I
using our American Express Cards as well when needed."  Id.  "It is
my intention to pay you $5,000 every month to be applied to the
loans.  In addition, we will cut you a check of 50% of the profits
(after expenses of course) . . . ."  Id.

28. On October 12, 2007, Wallem signed a Purchase and
Sales Agreement and Deposit Receipt, to begin the process of
purchasing the Tavern.  Pl.'s Ex. 17 ("PSA") at 1.   The seller
agreed to provide a second mortgage in the amount of $100,000 for
five years to help cover the transaction.  Id. at 5.  The closing
was scheduled to occur on or before November 7, 2007.  Id.  The
buyers were given until October 19 to submit a $10,000 deposit.
Id. at 6.

29. On October 19, 2007, Sandy transferred $10,000 to an

**United States District Court**
For the Northern District of California

escrow fund that had been established for the purchase of the
Tavern.  Pl.'s Ex. 19 ("Record of Wire Transfers") at 1.

        30. McClure and Wallem also sought a loan from the Bank
of New England to cover the majority of the purchase price for the
Tavern, and sought yet another loan from the Small Business
Administration ("SBA").  See TP at 236:9-16 (test. of Wallem);
Pl.'s Ex. 39 ("Oct. 29-30 Email Chain") at 1.

        31. Because it would take a considerable amount of time
to receive approval for the loan, McClure and Wallem decided to
structure the deal as a "lease-to-purchase," so that they could
begin operating the Tavern while waiting for the purchase to close.
TP at 192:3-8 (test. of Wallem).  On October 29, 2007, McClure
informed Sandy by email that, "in the interim we are going in THIS
week under a lease deal, with 100% of the rent and deposits to go
towards the down payment when we close the deal."  Oct. 29-30 Email
Chain at 1.

        32. At some point during this period, McClure or Wallem
apparently informed Sandy that they would require his contribution
to increase to $100,000.  See id.  Sandy expressed discomfort with
the transaction.  Id. at 1-2.

        33. On October 30, 2007, McClure drafted a contract,
titled "Financing Agreement," between Barrie Sandy and Paula
Wallem.  Id. at 2-4.  It stated that Wallem was to be the borrower,
and Sandy was to be the lender, of $200,000 from November 10, 2007.
Id. at 2.  This total included the "$100,000 lent on February 7th,
2007," in reference to the loan that was the subject of the
February Contract.  Id.  The other $100,000 was to be "lent on or
before October 31, 2007 . . . for deposits and rent on the Wild

**United States District Court**
For the Northern District of California

Boar acquisition, with 100% of these funds to be used/credited as the down payment needed to close on the transaction on or before December 21, 2007." Id.  The contract called for monthly installments of $5000, half of which was to be applied to the $100,000 loan that was the subject of the February Contract, with the other half to be applied to the new $100,000 loan.  Id. at 3. The contract stated that Wallem would own 50% of the tavern, and Sandy would own the other 50%.

34. The Financing Agreement between Wallem and Sandy was never executed, and there is no indication that Sandy accepted its terms.  In fact, Sandy indicated in an email on October 31 that he wanted to pull out of the acquisition entirely, although he sent another email several hours later stating that he had "too much personal investment in this thing to just end it." See Pl.'s Ex. 40 ("Oct. 31 Email Chain").  As Sandy testified, he had gotten "cold feet."  TP at 53:25-54:3 (test. of Sandy).

35. On November 2, 2007, McClure sent an email to Sandy, this time indicating that Sandy could acquire an interest in the Tavern with "NO GUARANTEE ON YOUR END for THE $900,000 LOAN WHATSOEVER."  Pl.'s Ex. 41 ("Nov. 2 Email") at 1.  He explained that "Paula is acquiring the Wild Boar asset for $1.025 million. The seller has agreed to give back $200,000 of that at closing, leaving $825,000 (plus closing costs) to be financed."  Id. McClure explained that "Paula wants to offer you $200,000 cash at closing for the use of $180,000 now, spread out over November 7th- December 28th."  Id.  This time, McClure offered Sandy a 10% equity ownership and a check for $5000 every month towards "the $100K owed . . . ."  Id.

13

**United States District Court**
For the Northern District of California

36. On November 3, 2007, Wallem sent Sandy an email itemizing a number of expenses and debts related to MB Equity and the Wild Boar.  One such item included salaries for McClure and Wallem in the amount of $5000 each per month.  Defs.' Ex. 514 ("Nov. 3, 2007 Email").  Two days later, on November 5, 2007, Sandy sent McClure an email stating that he "[a]gree[s] to salaries for you and Paula."  Defs.' Ex. 530 ("Nov. 5 Email").  In his testimony, Sandy acknowledged that he "pretty much went along with" the budget provided by Defendant, and "must have agreed to" their proposed salaries.  TP at 154:2-10 (test. of Sandy).

37. On November 6, 2007, Wallem signed two addendums to the PSA, with one extending the date of transfer of title to December 15, 2007, and another to January 14, 2008.  PSA at 7-8.  The addendum indicated that Wallem, Sandy, and/or assigns were the "buyer," however Sandy's name is crossed out.  Id.

38. Beginning on November 13, 2007, Sandy transferred additional funds to the Bank of New England to cover its due diligence fees.  TP at 60:2-11 (test. of Sandy); see Record of Wire Transfers at 2.  Between this date and January 3, 2008, Sandy made a total of eleven separate money transfers to MB Equity, escrow accounts established for the purchase of the Tavern, and the Bank of New England.  Record of Wire Transfers at 2.  $7500 was transferred to the Bank of New England, an additional $23,000 went to the seller's broker (which Sandy understood to be the escrow account), and roughly $62,000 went to MB Equity's bank account.  TP at 60:2-11 (test. of Sandy).  Sandy has represented that the funds sent to MB Equity were "to cover operating expenses in anticipation of purchasing the Wild Boar."  PFFCL ¶¶ 49, 53-56.  Together with

14

the initial escrow deposit of $10,000, Sandy transferred a total of $102,997.  Id. ¶ 33.

39. Because Sandy was aware that this was a lease-to-purchase agreement, and because Sandy approved of the use of the funds to cover the lease and operating expenses, the Court finds that Sandy could not have reasonably expected that all funds would be available to return to him if the purchase deal fell through. See TP at 45:3-5, 168:222-169:21 (test. of Sandy).  Aside from the unexecuted Financing Agreement, which Sandy never manifested acceptance to, there is no evidence to suggest that either McClure or Wallem personally or unconditionally guaranteed the loan.

40. On November 16, 2007, Wallem signed an "Agreement of Commercial Lease" for the Tavern on behalf of herself and MB Equity.  Pl.'s Ex. 15 ("ACL").  It stated that "[r]ental payment for November and December 2007 shall be credited towards the purchase price if transfer of title takes place in calendar year 2008.  Otherwise, 50% of all rents paid on time will be credited towards the purchase price, if transfer of title takes place on or before January 31, 2008."  Id. at 2.

41. On November 25, 2007, Wallem signed an addendum to the PSA, permitting the seller of the Tavern to use $5000 of the amount in the escrow deposit.

42. On December 12, 2007, Wallem executed yet another addendum to the PSA, this time acknowledging that the seller would leave $200,000 of "seller financing," recorded as a third mortgage amortized over 20 years.  PSA at 10.

43. In January of 2008, Wallem discovered that in order to secure the loan from the SBA, she and everyone else who held

15

**United States District Court**
For the Northern District of California

more than a 20% interest in MB Equity (i.e., Sandy) would need to personally guarantee the loan.  TP at 196:17-22, 231:8-232:19 (test. of Wallem).  Defendants informed Sandy of this requirement, and he declined to personally guarantee the loan.  Attempts were made to buy Sandy out of his interest in MB Equity, however he declined this as well.  Id. at 196:23-197:8; see also Pl.'s Ex. 51 ("Jan 28, 2008 Email Chain") at 1-2.  Wallem created Black Diamond Restaurant Group, LLC ("Black Diamond"), with another investor named Bob Poor, and hoped that this company would purchase the Tavern and rent it to MB Equity, thereby obviating the need for Sandy to personally guarantee the loan.  TP at 199:23-197:8 (test. of Wallem).

44. As Wallem repeatedly testified, id. at 190:20-191:6, 193:4-8, 194:15-195:20, 237:13-21, the terms of the purchase were constantly changing, as the banks and the SBA restructured the transaction or informed Defendants of different conditions for the loan.

45. For reasons that the parties do not adequately explain, the parties never closed on the deal to purchase the Tavern.  Id. at 198:6-14.  Defendants never reimbursed Sandy for the $102,997 that he had loaned to MB Equity, transferred to the seller's broker, or paid to the Bank of New England.

46. Throughout this period, there is no evidence that Wallem and McClure were able to successfully operate the Tavern at a profit.  Sandy has only been able to show that the Tavern had income that was subject to taxes by the State of New Hampshire. Pl.'s Ex. 10 ("Collection Letter").

47. Throughout this period, McClure and Wallem made

16

numerous sporadic withdrawals from MB Equity's bank accounts[8] to reimburse themselves for Tavern expenses paid with their personal credit cards, and to cover less than the full amounts of their agreed-upon salaries.  TP at 194:1-14; 211:17-212:2, 215:5-17 (test. of Wallem).  Sandy has not attempted to show that Defendants ever withdrew more than the amount that the parties had agreed upon, or that any withdrawals to cover credit card expenses were improper.  However, Wallem admitted to making one "mistake": She made a personal mortgage payment directly from one of MB Equity's bank accounts, rather than transferring this money to her own account as a salary before making the mortgage payment.  Id. at 268:22-269:5.  Sandy has not attempted to show that the amount of this withdrawal, or any of the other withdrawals considered independently or collectively, would have exceeded Wallem and McClure's agreed-upon salaries for any particular period.

III. **CONCLUSIONS OF LAW**

    A.    **Breach of Contract**

    Sandy's first cause of action is for breach of contract. Compl. ¶¶ 65-69.  Sandy contends that Defendants have breached an agreement to repay Sandy the principal of the $100,000 loan, plus interest and a penalty, as well as 80% of all losses related to the Ocean Ridge Condos.  Pl.'s Br. at 10.  Each of these agreements are reflected in the February Contract.

---

[8] MB Equity has two bank accounts, one with Bank of America and the other with TD Banknorth, which Defendants opened in order to facilitate transactions in North Conway, since Bank of America was not easily accessible from that location.  See TP at 11:12-19 (test. of Wallem).

United States District Court
For the Northern District of California

1          **1.   <u>Legal Standard</u>**

2          The February Contract contains no choice-of-law provision, and

3    the parties have not expressed a preference for any particular

4    state law.  As this Court is sitting in diversity, it must apply

5    California's choice-of-law rules to determine the law governing the

6    February Contract.  <u>See</u> <u>Downing v. Abercrombie & Fitch</u>, 265 F.3d

7    994, 1005 (9th Cir. 2001).  In the absence of a contractual choice-

8    of-law provision, the Court must consider "(a) the place of

9    contracting, (b) the place of negotiation of the contract, (c) the

10   place of performance, (d) the location of the subject matter of the

11   contract, and (e) the domicil, residence, nationality, place of

12   incorporation and place of business of the parties.  These contacts

13   are to be evaluated according to their relative importance with

14   respect to the particular issue." <u>Stonewall Surplus Lines Ins. Co.</u>

15   <u>v. Johnson Controls</u>, 14 Cal. App. 4th 637, 646 (Ct. App. 1993)

16   (quoting Restatement (Second) of Conflict of Laws, § 188(2)(1971)).

17   The parties have not provided information regarding most of these

18   factors.  However, the primary locus of MB Equity's activity

19   appears to have been in Maine, and the primary purpose of the

20   contracts -- to finance the acquisition of a chain of boutique

21   hotels -- resulted in MB Equity's offer to purchase a hotel

22   property within the state of Maine.  FF ¶¶ 4, 21.[9]  To perform his

23   part of the contract, Sandy transferred funds to MB Equity's bank

24   account in Maine.  <u>Id.</u> ¶ 18.  In the absence of any compelling

25   evidence that the law of a different forum should govern, the Court

26   concludes that the law of Maine is applicable to the February

27

28   [9] "FF" refers to the "Findings of Fact" section of this Order, Part
     II, <u>supra</u>.

18

United States District Court
For the Northern District of California

1  Contract.[10]

2      To prevail on a breach of contract claim under the law of

3  Maine, Sandy must establish: "(1) breach of a material contract

4  term; (2) causation; and (3) damages." See Maine Energy Recovery

5  Co. v. United Steel Structures, Inc., 724 A.2d 1248, 1250 (Me.

6  1999).

7              **2.   The Loan**

8      The February Contract consists of two distinct parts.  The

9  first involves Sandy's $100,000 loan to MB Equity, and McClure's

10 personal guarantee of that loan.  McClure unambiguously manifested

11 his intent to enter a binding contract with Sandy by executing the

12 February Contract.  FF ¶ 17.  Sandy clearly intended to enter the

13 February Contract when he loaned $100,000 to MB Equity, and thereby

14 performed his part of the bargain.  Id. ¶ 18.  The contract

15 explicitly states that "Mark McClure agrees to accept full

16 responsibility" for the loan and all interest charges, and to keep

17 said charges current, "[i]f for any reason necessary funding is not

18 raised to replace [the] loan from Barrie Sandy . . . ."  February

19 Contract at 1.  Funding was never raised to replace the $100,000

20 loan, FF ¶ 19, and McClure has never repaid the loan himself.

21 Therefore, Sandy has established that McClure has breached the

22 contract.  This caused damages to Sandy, in the full amount

23 contemplated by the February Contract.

24     The February Contract states that all interest payments shall

25 be kept current, but it does not state an interest rate.

26 ─────────────────────────
27 [10] While Sandy provides no analysis to support its applicability,
   his trial brief cites California law to support his contract claim.
   Pl.'s Br. at 10-11.  The Court notes that the substantive outcome
28 of this cause of action would not be different if the laws of
   California were applicable to the contract.

**United States District Court**
For the Northern District of California

1   Similarly, it states that there will be a penalty of 10% of the

2   delinquent loan amount if any payment is delinquent, but it does

3   not set a due date.  February Contract at 1.  The February Contract

4   is therefore ambiguous with respect to the interest rate and

5   deadline for the loan.  This Court, as the finder of fact, may

6   consider parol evidence to resolve these ambiguities.  See General

7   Electric Capital Corp. v. Ford Motor Credit Co., No. 92-245, 1992

8   U.S. Dist. LEXIS 19715, *16 (D. Me. Dec. 15, 1992) (citing Palmer

9   v. Nissen, 256 F.Supp 497 (D. Me. 1966)).  The Court has concluded

10  that McClure and Sandy agreed to an 8% interest rate and a one-year

11  due date for the loan at issue in the February Contract.  FF ¶ 21.

12          **3.   The Ocean Ridge Condos**

13      The second part of the February Contract relates to McClure's

14  agreement regarding "[f]ulfillment of leasing and/or sale of" the

15  Ocean Ridge Condos "purchased in partnership and agreement to

16  assume 80% of unpaid monthly/annual debt."  February Contract at 1.

17  The February Contract refers to this as a "previous agreement," and

18  it does not provide sufficient detail with respect to McClure's

19  management obligations to allow this Court to make a finding that

20  McClure in fact abandoned the property in violation of their

21  agreement.  Nor has Sandy sufficiently testified that Defendants'

22  decision to cease paying mortgage payments on one of the condos in

23  November of 2007 constituted a contractual breach, rather than an

24  authorized business decision necessitated by MB Equity's precarious

25  financial situation.  See FF ¶ 12.  However, McClure's agreement

26  "to assume 80% of unpaid monthly/annual debt" is manifest on the

27  face of the February Contract, as well as prior correspondences.

28  Id. ¶¶ 7, 9.  Sandy testified that he spent a total of $52,341.76

to cover such fees and debts.  McClure is liable for 80% of this amount, and he has not paid it.  Sandy therefore established that McClure is in breach of this portion of the contract, and that he has suffered damages of at least $41,873.40 (i.e., 80% of $52,341.76) as a result.

McClure argued in his testimony that Sandy breached the agreement, "[t]herefore it nullified this agreement. . . .  He didn't provide me 50% ownership [of the Ocean Ridge Condos]."  TP at 323:3-17 (test. of McClure).  The Court construes this as an assertion that McClure was excused from performance because of Sandy's failure to transfer an ownership interest in the condos to McClure.  However, the Court has already found that the parties never agreed to share title to the condos.  FF ¶ 10.  Sandy was therefore not in breach of this part of the agreement.  Furthermore, the Court notes that the parties expressly treated the agreement with regard to the Ocean Ridge Condos as a separate agreement made "in addition to" the $100,000 loan that Sandy provided.  See February Contract at 1.  Therefore, even if Sandy had been in breach of the agreement related to the Ocean Ridge Condos, this would not necessarily excuse McClure from his personal guarantee of the $100,000 loan.

### 4.   Damages

McClure is liable for the $100,000 principal of the loan in the February Contract.  He is also liable for thirty-four months of interest, at 8%, minus the $8007 already paid to cover the first year of interest.  This totals $14,659.66.  Because McClure did not repay Sandy when the loan became due, one year after the loan was made, he faces a penalty of 10% of the unpaid loan amount.  This

**United States District Court**
For the Northern District of California

1   totals $11,465.96.  Sandy's total contractual damages related to

2   this portion of the February Contract amount to $126,125.62.

3        As to McClure's liability with regard to the Ocean Ridge

4   Condos, his 80% share of the monthly or annual debt totals

5   $41,873.40.  Although Sandy contends that Defendants should also be

6   liable for 80% of the difference between the purchase price and the

7   selling price of the condos, Sandy also testified that this debt

8   has been forgiven.  TP at 99:13-101:13 (test. of Sandy).  Sandy

9   claims that he will need to report this as income when filing his

10  taxes, and could therefore face a substantially increased tax

11  liability, id., however he has not identified any evidence or

12  provided any testimony that would allow this Court to calculate the

13  losses that he will face from reporting such income.  As such, any

14  award based on this amount would be purely speculative, and is

15  therefore unwarranted.  See Michaud v. Steckino, 390 A.2d 524, 530

16  (Me. 1978) ("[I]t is well settled law that damages are not

17  recoverable when uncertain, contingent, or speculative.").  Total

18  damages are therefore $167,999.02.

19      **B.  Other Contract-Based Claims**[11]

20       Sandy also asserts claims for money had and received, unjust

21  enrichment, and account stated.  Compl. ¶¶ 70-80, 137-141.  He has

22  not proven any of these causes of action.  Sandy contends that

23  Defendants owe him a total of $102,997 (the amount paid to acquire

24  _____

[11] As Sandy's trial brief cites only California and Ninth Circuit
25  law, the Court will assume that California law applies for the rest
of this Order.  In making this assumption, the Court notes that
26  Sandy has not proven any of his other causes of action, as
construed by California law.  The Court would not make this
27  assumption if it resulted in any detriment to Defendants; however,
because Plaintiff has chosen to base his arguments solely on
28  California law, he cannot complain when the Court analyzes his
claims under California law and finds them lacking.

**United States District Court**
For the Northern District of California

1  the Tavern).  Pl.'s Br. at 12.  The Court accepts Sandy's

2  characterization of this money as a loan, but rejects his

3  conclusion that it can be enforced against Defendants.

4       The Court could reject all three of these causes of action

5  solely on the basis that Sandy has failed to show that he lent this

6  money to McClure or Wallem personally, as opposed to MB Equity.  As

7  Sandy seeks to collect upon these loans from Defendants, it is his

8  burden to establish a basis for their liability.  Sandy has stated

9  that he transferred the money to MB Equity in order to fund its

10  operating expenses.  PFFCL ¶¶ 49, 53-56.  The record does not

11  reflect any personal guarantee from Wallem or McClure to repay the

12  loan.  Although McClure drafted a loan contract between Wallem and

13  Sandy at one point, there is no evidence that Sandy accepted its

14  terms, and McClure made a separate offer to Sandy soon thereafter.

15  FF ¶¶ 33-35.

16       Sandy argued in his Complaint that "Defendant MB Equity is a

17  mere shell of individual Defendants Wallem and McClure."  Compl.

18  ¶ 12, <u>see also</u> PFFCL ¶ 102.  However, Sandy's trial brief and

19  testimony were devoid of any legal analysis directed towards

20  piercing MB Equity's corporate veil.  It is Plaintiff's burden to

21  show facts sufficient to pierce the corporate veil.  <u>Mid-Century</u>

22  <u>Ins. Co. v. Gardner</u>, 9 Cal. App. 4th 1205, 1213 (Ct. App. 1992).

23  "The purpose of the doctrine is not to protect every unsatisfied

24  creditor, but rather to afford him protection, where some conduct

25  amounting to bad faith makes it inequitable . . . for the

26  equitable owner of a corporation to hide behind its corporate

27  veil."  <u>Id.</u> (quoting <u>Associated Vendors, Inc. v. Oakland Meat Co.</u>,

28  210 Cal. App. 2d 825, 842 (1962)).

**United States District Court**
For the Northern District of California

Sandy has failed to show bad faith on the part of either Defendant -- instead, McClure and Wallem were apparently seeking in good faith to purchase and operate the Tavern.  Nor has Sandy showed that it would be inequitable to protect McClure and Wallem from the debts of MB Equity.  In spite of Sandy's broad allegations of abuse, the record identifies only one instance of abuse of the corporate form: Wallem's improper mortgage payment made from MB Equity's bank account.  FF ¶ 47.  Sandy's assertions that Defendants misused the funds for the Tavern are otherwise unsubstantiated.  Sandy has not shown that Defendants ever withdrew funds that were in excess of Defendants' agreed-upon salaries, id. ¶ 36, and Sandy was made aware of Defendants' intention of using their personal credit cards to cover the Tavern's operating expenses, id. ¶ 27.

Even assuming that MB Equity's veil can be pierced, or that these funds can be characterized as loans made directly to Defendants, Sandy has failed to support his contract-related claims.  Sandy has not proven that Defendants ever agreed to unconditionally repay the loan.  See id. ¶ 39.  Sandy certainly could have expected much of the loan to be repaid upon the closing of the deal to purchase the Tavern.  Id.  However, the deal never closed in spite of Defendants' good-faith efforts to purchase the Tavern and operate it profitably.  None of Sandy's causes of action suffice to convert his loan to MB Equity into a risk-free investment.

The Court now turns to the individual contract-related causes of action.  "The essential element of an action for money had and received is the allegation that the defendant had and received the

**United States District Court**
For the Northern District of California

money to and for the use and benefit of a plaintiff. . . . [I]t must appear that the money held by defendant is the property of plaintiff and that defendant is obliged in equity and good conscience to restore it to him." Macbeth v. West Coast Packing Corp., 83 Cal. App. 2d 96, 98 (Ct. App. 1947). Sandy has failed to show that Defendants improperly used any benefits from the loan, or siphoned money for other purposes; rather, Defendants used the proceeds in a manner that Sandy had assented to, i.e., operating the Tavern and paying its leases. He has therefore failed to prove his claim for money had and received.

Sandy has not proven his claim for unjust enrichment. "[T]he elements for a claim of unjust enrichment [are] receipt of a benefit and unjust retention of the benefit at the expense of another." Lectrodryer v. Seoulbank, 77 Cal. App. 4th 723, 726 (Ct. App. 2000). Sandy has failed to show that the money that he loaned to MB Equity was not used for its intended purpose. Had Defendants' efforts been successful, Sandy would have enjoyed the benefit through his interest in the Tavern.

Sandy has not stated a claim for account stated. This claim requires Sandy to establish an agreement as to a particular amount due, and "a promise by the debtor, express or implied, to pay the amount due." Zinn v. Fred R. Bright Co., 271 Cal. App. 2d 597, 600 (Ct. App. 1969). The record does not reflect an unconditional promise to return the stated sum to Sandy; rather, it shows that Sandy could expect to be repaid, in part or in full, upon closing.

### C. Breach of Implied Covenant of Good Faith and Fair Dealing

Sandy's Complaint includes a broad claim that Defendants breached an implied covenant of good faith and fair dealing,

without specifying which activities breached this duty.  Compl.
¶¶ 81-86.  Sandy's trial brief provides a bit more detail by
alleging that Defendants "collected revenues from the Wild Boar,
omitted material facts to keep Plaintiff's money coming in, stopped
paying Plaintiff's mortgages, refused to pay back promised funds,
and did nothing while Plaintiff collapsed under crippling
mortgages, taxes, condominium fees, etc."  Pl.'s Br. at 13-14.

To the extent that this cause of action is based upon the
February Contract or the Ocean Ridge Condos, the Court finds that
it is duplicative of Sandy's breach of contract claim, for which he
may independently recover.  Sandy has not shown that he is entitled
to recover for any breach of duty beyond the express promises made
in the February Contract.

To the extent that this cause of action is based upon the
transactions surrounding the Tavern, Sandy has not proven his
claim.  "The implied covenant of good faith and fair dealing
requires that neither party to a contract will injure the right of
the other to receive the benefits of the agreement."  Johnson v.
Mutual Ben. Life Ins. Co., 847 F.2d 600, 603 (9th Cir. 1988)
(citation and internal quotation marks omitted).  Sandy has not
proven that Defendants willfully used their discretion to deprive
him of the benefits of the agreement; rather, the records reflect
that whatever discretion Defendants possessed under their
arrangement with Sandy was used to attempt to procure and operate
the Tavern in good faith.

**D.  <u>Negligence</u>**

Sandy's fifth cause of action sounds in negligence.  Compl.
¶¶ 87-91.  Although Sandy's Complaint includes a scatter-shot

paragraph that purports to name eleven distinct instances of negligence, Compl. ¶ 90, Sandy did not attempt to prove the elements of negligence with respect to most of these instances at trial.  Sandy's trial brief only asserts breaches of Defendants' duty based upon certain failures to disclose information, including (a) their financial liabilities, (b) the transactions and documents related to the purchase of the Tavern, (c) their intended use of the funds transferred to MB Equity and escrow accounts, and (d) the gross mismanagement of Sandy's capital.  Pl.'s Br. at 14-15.

"The well-known elements of a cause of action for negligence are duty, breach of duty, proximate cause, and damages." <u>Minch v. Dep't of California Highway Patrol</u>, 140 Cal. App. 4th 895, 900-01 (Ct. App. 2006).  Sandy has failed to prove that Defendants' use of funds were improper or constituted gross mismanagement.[12]  Sandy has not established that Defendants' failure to disclose any particular documents or transactions to him caused him any damages. As to Defendants' failure to disclose McClure's bankruptcy, the most that Sandy can assert is that he would not have worked with Defendants or lent money to MB Equity if he had known of the bankruptcy.  However, the Court finds that any breach of duty that occurred by failing to disclose McClure's bankruptcy did not proximately cause Sandy's injury.  Sandy has not proven that the bankruptcy caused the Tavern deal to collapse.  Indeed, by the time the parties began their efforts to procure the Tavern, McClure had relinquished his interest in MB Equity.  FF ¶ 4.  Sandy has

---

[12] Although Wallem did admit to making one improper payment from MB Equity's bank account, Sandy has not shown that he was damaged by this.  <u>See</u> FF ¶ 46.  Had Wallem properly made a withdrawal as a salary for herself and McClure, and then paid her mortgage with it, then Sandy would be in the same position he is in now.

United States District Court
For the Northern District of California

1    therefore failed to prove the elements of his negligence claim.

2        **E.    Fraud**

3        Sandy asserts claims for intentional misrepresentation,

4    negligent misrepresentation, concealment, promissory fraud, and

5    constructive fraud.  Compl. ¶¶ 92-120.

6        Sandy's claims for intentional and negligent misrepresentation

7    are based upon a number of representations that Defendants made

8    about the terms and conditions of the deal to purchase the Tavern.

9    Pl.'s Br. at 15-16.  However, the Court has found that the terms of

10   the deal were frequently changing, FF ¶ 44, and Sandy has failed to

11   show that Defendants' "misrepresentations" were the result of

12   knowing or negligent misstatements, rather than good-faith

13   assertions of the terms of the deal as contemplated at the times

14   that the statements were made.[13]  For example, Defendants

15   represented to Sandy that he would not have to guarantee any

16   portion of the larger loan that they were seeking to secure the

17   Tavern.  Id. ¶ 35.  There is no evidence that Defendants knew that

18   this would be false when they made this statement, and Sandy has

19   not attempted to show that the exercise of reasonable care would

20   have revealed that he would eventually be required to guarantee the

21   SBA loan.  Sandy's claims for promissory fraud fail for the same

22   reasons -- there is no evidence that Defendants intended to not

23

24   [13] Sandy also claims that Defendants fraudulently represented to
     him that he was liable for a particular note, referred to by the
25   parties as the "AAA Note."  See Pl.'s Br. at 16.  The record
     reflects that the debtors on this note made one attempt to collect
26   from Sandy, that Sandy declined on the basis that his signature on
     the note had been forged and he was not personally liable, and that
27   the debtors have not attempted to collect upon the note since that
     time.  Pl.'s Exs. 59-60; TP at 40:20-42:5 (test. of Sandy).  Sandy
28   has failed to show that he was damaged by this note, or by any
     representations made on the basis of this note.

**United States District Court**
For the Northern District of California

perform on any particular promise (e.g., repay a substantial amount of the loan with funds provided by the seller of the Tavern) at the time that the promise was made.

Sandy bases his claim for constructive fraud on the same grounds as his negligent and intentional misrepresentation claims. Pl.'s Br. at 19.  To state a claim for constructive fraud, a plaintiff does not need to establish fraudulent intent, so long as the parties are in "a fiduciary or confidential relationship."  See Salahutdin v. Valley of Cal., 24 Cal. App. 4th 555, 562 (Ct. App. 1994).  Plaintiffs may recover for "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him . . . ."  Cal. Civ. Code § 1573.  Sandy has failed to demonstrate that Defendants "gain[ed] an advantage" by any of their alleged misstatements at Sandy's expense.  Any infusion that they received from Sandy on the basis of these alleged misstatements were used to further the purchase and operation of the Tavern, in which Sandy was to own a 50% interest.

Sandy failed to prove his claim for concealment.  FF ¶¶ 23-24. The elements of a claim for fraudulent concealment are: "1) suppression of a material fact; 2) by one who is bound to disclose it . . . ; 3) with intent to deceive a person unaware of the concealed fact and who would not have acted had he known of the fact."  Melanson v. United Air Lines, Inc., 931 F.2d 558, 563 (9th Cir. 1991).  Sandy's strongest claim is that Defendants were under a duty to disclose to him McClure's bankruptcy proceeding -- however, by the time it occurred, McClure was no longer operating

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

as a shareholder of MB Equity, FF ¶ 4, and Sandy has not pointed to any evidence that this bankruptcy proceeding ever interfered with the business of MB Equity or the acquisition of the Tavern.

Sandy has also failed to show that Defendants concealed certain facts about the Tavern transaction from him, for example, that the escrow deposits would be used to pay the lease, id. ¶ 39, that Defendants had "unilaterally" amended the commercial lease, that Sandy would be required to guarantee the SBA loan, and that Defendants were making withdrawals from MB Equity's accounts.  Some of these "concealed" facts were clearly disclosed to Sandy (e.g., salaries, FF ¶ 36).  Others have not been proven to be material (e.g., details of the amendments to the purchase terms, FF ¶¶ 37, 41-42, or the gross revenue of the Tavern when it apparently had no profits, FF ¶ 46).  Others still were apparently disclosed as soon as they were learned by Defendants (e.g., the requirement that Sandy guarantee the SBA loan, FF ¶ 43).  Sandy also claims that Defendants failed to inform him when they stopped paying the mortgages and fees on the first Ocean Ridge Condo.  FF ¶ 12. Assuming that this was intentionally concealed from him, Sandy has not identified how he was harmed by this concealment, aside from a decline in his credit score.  Eighty percent of the amount that he paid is recoverable as contractual damages, and the February Contract suggests that Sandy would have been liable for the remaining amount, regardless of any concealment.

## F.   Breach of Fiduciary Duty

Sandy claims that Defendants breached their fiduciary duties to him in a number of ways.  Business partners, including members of LLCs that are in structured like partnerships, can hold

30

**United States District Court**
For the Northern District of California

1  fiduciary obligations to one another.  See Wolf v. Super. Ct., 107

2  Cal. App. 4th 25, 29-30 (Ct. App. 2003); Cal. Corp. Code § 17153

3  (stating that managers of LLCs owe fiduciary duties to LLC and its

4  members, just as partners owe duties to one another).

5      Sandy first argues that Defendants breached their duty of

6  reasonable care by not disclosing McClure's bankruptcy proceedings

7  to Sandy.  Pl.'s Br. at 21.  Sandy fails to explain how this

8  separate proceeding, which went forward against McClure when he was

9  not a shareholder of the LLC, and which apparently did not affect

10 the business or purchase of the Tavern, constituted a breach of

11 Defendants' duty of care.

12     Sandy alleges that Defendants violated their duty of loyalty

13 to him by forming Black Diamond, by asking Sandy to give up his

14 share of MB Equity, by negotiating the Tavern transaction with the

15 seller, and by not protecting Sandy's escrow deposits.  Id. at 21-

16 22.  However, each of these actions appear to be Defendants'

17 reasonable attempts to overcome the hurdles that they encountered

18 in purchasing and operating the Tavern, rather than instances of

19 exploitation of Sandy's good will.

20     **G.    Intentional Infliction of Emotional Distress**

21     To prove an IIED claim, a plaintiff must show "(1) extreme and

22 outrageous conduct by the defendant with the intention of causing,

23 or reckless disregard of the probability of causing, emotional

24 distress; (2) the plaintiff's suffering severe or extreme emotional

25 distress; and (3) actual and proximate causation of the emotional

26 distress by the defendant's outrageous conduct."  Christensen v.

27 Super. Ct., 54 Cal. 3d 868, 903 (1991).  Conduct is only "extreme

28 and outrageous" when it was "so extreme as to exceed all bounds of

United States District Court
For the Northern District of California

1  that usually tolerated in a civilized community." <u>Davidson v. City</u>

2  <u>of Westminster</u>, 32 Cal. 3d 197, 185 (1982) (citation omitted).  For

3  emotional distress to be severe, it must be "of such substantial

4  quantity or enduring quality that no reasonable man in a civilized

5  society should be expected to endure it." <u>Fletcher v. Western</u>

6  <u>Nat'l Life Ins. Co.</u>, 10 Cal. App. 3d 376, 397 (Ct. App. 1970).  The

7  Court finds that Sandy has failed to prove that Defendants' conduct

8  was sufficiently extreme or outrageous to support a claim for IIED.

9      **H.   Defendants' Joint and Several Liability**

10         Sandy claims that Defendants are jointly and severally liable

11  for any debt or liability that either of them incurred, based upon

12  the fact that they are husband and wife. Pl.'s Br. at 9-10.  In

13  doing so, he incorrectly characterizes Defendants' property as

14  community property that is controlled by California law. <u>Id.</u> at

15  10.  California law does not purport to reach out and transform the

16  property of non-resident married couples into community property,[14]

17  and Sandy has submitted no evidence to suggest that Defendants have

18  ever resided in California.  This Court finds only that McClure is

19  personally liable to Sandy in the amount of $167,999.02.  Judgment

20  is so awarded.

21  ///

22  ///

23  ///

24  ///

25  ///

26

27  [14] "Except as otherwise provided by statute, all property, real or
    personal, wherever situated, acquired by a married person during

28  the marriage while domiciled in this state is community property."
    Cal. Fam. Code § 760.

**IV.**   <u>**CONCLUSION**</u>

As to Plaintiff's first cause of action for breach of contract, the Court finds for Plaintiff Barrie Sandy and against Defendant Mark McClure in the amount of $167,999.02.   The Court finds that Plaintiff Barrie Sandy has not proved his other causes of action.

IT IS SO ORDERED.

Dated: December 18, 2009



UNITED STATES DISTRICT JUDGE